PACIFIC COAST MUSIC JOBBERS, INC., et al., Petitioners-Appellants,

v.

COMMISSIONER OF INTERNAL REVENUE, Respondent-Appellee.

No. 71-2465.

United States Court of Appeals, Fifth Circuit.

March 22, 1972.

A. Walter Socolow, New York City, for petitioners-appellants.

Scott P. Crampton, Asst. Atty. Gen., K. Martin Worthy, Chief Counsel, Edward D. Robertson, I. R. S., Richard Farber, Meyer Rothwacks, Thomas L. Stapleton, Richard Halberstein, Attys., Tax Div., Dept. of Justice, Washington, D. C., for respondent-appellee.

Before JOHN R. BROWN, Chief Judge, and GOLDBERG and MORGAN, Circuit Judges.

GOLDBERG, Circuit Judge:

We are asked to construe a contractual arrangement purportedly falling under the tax aegis Subchapter S.[1] In construing the underlying contracts and their tax implications, we must view the situation practically and realistically. There are also technical considerations. A taxpayer cannot simply enter a telephone booth and change into his Subchapter S suit. He must file a specific written election to be so taxed. It is admitted that appellant taxpayer did not so elect; nevertheless, he seeks the power to leap tall tax requirements at a single bound. We conclude, however, that Pacific Coast Music Jobbers, Inc., was not a Subchapter S corporation in 1963 or 1964, the years in question here, because the corporation's sole stockholder as of November 1962, appellant Charles H. Hansen, failed to file a Subchapter S election, 26 U.S.C.A. § 1372(a). In addition, we conclude that appellant Hansen was taxable for constructive receipt of dividends distributed by Pacific during fiscal 1964. Therefore, we affirm the judgment of the Tax Court, 55 T.C. 866, that Pacific is taxable as a normal corporation for 1963 and 1964, and that Hansen is individually taxable as constructive recipient of $31,650 in dividends distributed by Pacific during those two years.

Hansen and his wife entered into a tandem of agreements on November 23, 1962, with the three shareholders of Pacific Jobbers, a California corporation. Two of the shareholders, James L. Haley and Peter L. Caratti, owned 20 shares apiece of the outstanding 50 shares in

1. 26 U.S.C.A. §§ 1371–1381.

the corporation; the third shareholder, Mary W. Thomson, owned 10 shares.[2] In addition to being the only shareholders, Haley, Caratti, and Thomson were also the only officers and full-time employees of Pacific. Prior to the November agreements Haley approached Hansen, who held interests in several music-oriented corporations throughout the country, with an offer to sell Haley's interest in Pacific. Hansen did not wish to invest only in Haley's share at that point. However, after being unable to locate another buyer for Haley's 20 shares, Hansen proposed purchasing the entirety of the Pacific stock himself. Both Caratti and Thomson were responsive to Hansen's suggestion, and their respective accountants set to work. The Pacific accountant estimated a business worth of between $80,000 and $100,000, based on the price that Hansen had paid for a comparable business and on a reasonable estimate of the corporation's future income computed on its income for the five-year period immediately preceding the proposed sale year. Philip Becker, Hansen's accountant and financial adviser for a quarter-century, valued the business at between $25,000 and $30,000. Both Hansen and Becker were thorough familiar with Pacific's earnings for the previous decade.

It appears that Becker then evolved the plan in question in order to allow the sellers to enjoy the earnings of the company for the next five-year period, and, the Government contends, in order to allow the sellers to realize the purchase price that they had proposed and to allow Hansen to remit the purchase price over an extended period of time. Pursuant to Becker's suggestion, the sellers submitted to Becker a list of their expected earnings for the five-year period subsequent to fiscal 1962, and Becker approved them as reasonable estimates.

Hansen then simultaneously entered into two agreements in November of 1962. The first agreement between Hansen and the Pacific shareholders provided that each seller was to sell his or her shares to Hansen for $500 per share; that the corporation should continue its usual business until at least August 31, 1967; that each shareholder would have the right to receive all dividends and earnings until August 31, 1967; that all shares in the corporation would continue to be registered in the names of the sellers until October 1, 1967; that the sellers would continue to elect Subchapter S tax status for Pacific until August 31, 1967; and that the sellers were to report and to pay taxes on their respective shares of corporate income until August 31, 1967. In addition, the stock certificates were to be endorsed and delivered to Hansen's attorney to hold in escrow until October 1, 1967, at which time the stock was to be delivered to Hanson. Finally, the sellers were to execute and deliver to Hansen their irrevocable proxies authorizing Hansen to exercise full voting rights to the stock during the entire escrow period. Although it appears to have been originally contemplated that the $25,000 purchase price for the stock (at $500 per share) would be paid pro rata to each of the sellers at the same time, it was later agreed that the payments would be staggered. According to the first November agreement, Haley was to receive his $10,000 when the agreements were executed, Caratti his $10,000 the following year, and Thomson her $5,000 in October of 1964. Haley and Caratti were paid on schedule; Thomson received her $5,000 one year later than the agreement provided.

The second agreement, although executed the same day, was termed by the parties a "supplement" to the first agreement. Under its terms Hansen agreed that "notwithstanding the provisions" of the first agreement, Pacific would pay to each seller "as dividends, earnings or other ordinary income" on his or her

---

2. Hansen executed two agreements with each seller. The agreements involving Haley and Caratti are almost exactly alike, and the agreement involving Thomson differs only in that the stock owned and the amounts due are half those of the Haley/Caratti contracts.

shares a specific amount of money each year, decreasing in amount over the five-year escrow period.[3] If Pacific did not earn enough during any given fiscal year to allow the sellers to receive the agreed-upon amounts, Hansen contracted to make up the difference himself. If he did not make up any deficiencies within 90 days of demand by the individual seller, the escrow agreement was to terminate and the sellers were to receive their stocks back. If Pacific earned more than the amount prescribed to the sellers in the supplementary agreement, the sellers were not to distribute the excess but were to hold it for Hansen; Hansen, in turn, agreed to pay all income taxes attributable to any undistributed earnings under the agreement. Pursuant to the first agreement, the sellers did deliver their stocks to the escrow agent, although the stocks continued to be registered in their names. The initial payment to Haley was made, and the corporation then began to operate under the 1962 contracts.

In 1963 the taxable income of the corporation was precisely that owing to the sellers under the supplementary agreement. In 1964 the corporation earned over $10,000 more than the total distributions required under the supplementary agreement. According to the terms of the supplement, that 1964 excess should have been held and accumulated for Hansen, but it appears that the sellers distributed the entire 1964 profit to themselves and paid taxes on the distributions.[4] However, the three sellers did receive payments from Pacific which corresponded to the tax that each paid on that portion of the corporation's undistributed taxable income which he or she reported at the end of the fiscal year in August (contrary to the terms of the supplement) but did not actually receive until the January after fiscal 1964. It does appear from the record that the sellers eventually received the entire earnings from fiscal 1964, despite the terms of the supplement, and continued to receive the full earnings of the corporation until the escrow terminated in 1967. The total profits of Pacific during the five-year period in question were $85,383.51, all of which was distributed by the corporation to the sellers. Under the terms of the supplement the sellers were to have received distributions totaling $73,250 over the five-year period.

The business operations of Pacific, meanwhile, changed considerably after the agreements were executed. Haley retired within one month of the agreement and was replaced by John J. Houdek, an employee of Hansen for about fifteen years. Haley continued as a director, although he did not attend stockholder meetings nor did he continue to participate in the everyday functioning of the business. Houdek was elected vice-president of the corporation and served as the corporation's manager until his death in 1966; at that time another old Hansen employee from New York came in to manage the business. Caratti retired from full-time work in 1963 and worked only one day per week after that. Thomson agreed in a 1962 document that she would work for the corporation until 1965 and that she would not engage in other commercial activity during that period. Following that agreement Thomson worked only one day per week. Houdek signed the Thomson agreement in behalf of Pacific. Although Becker did not formally audit Pacific himself, Haley and Caratti undertook a complete inventory of the business after the agreements

3. The amounts listed in the supplementary agreement were as follows:
   Haley and Caratti were to receive $6,500 apiece the first year (1963), $6,200 the second, $5,900 the third, $5,600 the fourth, and $5,300 the fifth and final year. Thomson was to receive $3,250 in the fiscal year ending August 31, 1963, $3,100 in fiscal 1964, $2,950 in 1965, $2,800 in 1966, and $2,750

in 1967. These payments were to be made in addition to the $25,000 which was to be paid over a three-year period (at $500 per share).

4. The Tax Court stated incorrectly that the agreements called for Hansen to pay the tax on amounts earned in excess of the supplementary agreement's schedule of payments to the sellers.

in the presence of two of Hansen's employees. At no time during the five-year period in question did the sellers actually meet to discuss operations as shareholders or directors, although they did sign "minutes" in 1963 and 1964, as directors that purported to ratify all corporate acts of the preceding year and to declare the undistributed taxable income to be payable as dividends to the stockholders.

On this background of facts, the Commissioner assessed a deficiency to the corporation, holding that Pacific could not receive Subchapter S treatment after 1962 since, the Commissioner concluded, Hansen became a Pacific shareholder in 1962 and did not file an election for the Subchapter S treatment. At the same time the Commissioner assessed a deficiency to Hansen individually for constructive receipt of the dividends paid to the sellers by Pacific, alleging that Hansen was the sole stockholder of Pacific as of 1962 and that the dividends were being distributed as part of Hansen's payment of the purchase price. Hansen sought relief from the Tax Court. The Tax Court found for the Commissioner, basing its conclusions on the findings of fact sketched above, and Hansen appealed to this court. We find the Tax Court correct in its judgment, and we affirm.

If Hansen assumed ownership of any stock in Pacific during 1963 and 1964, the Subchapter S status of Pacific was lost since Hansen admittedly never filed his consent. We conclude, as did the Tax Court, that Hansen held sufficient incidents of ownership by virtue of the 1962 agreements to make him the sole stockholder for purposes of electing to be taxed under Subchapter S.

The conclusion that we have reached, which the Government urged below and which the Tax Court reached below, is that the payments outlined in the two agreements of November 1962 were installment payments for the immediate sale of the business. See Rupe Investment Corp. v. Commissioner of Internal Revenue, 5 Cir. 1959, 266 F.2d 624. In practical terms, the November agreements shifted the plurality of the incidents of ownership in Pacific from the sellers to Hansen. The escrow arrangement was merely the sellers' way of protecting their continuing payments of the purchase price. It is the conclusion of this court that the agreements of 1962, taken together and in their practical context, amounted to an installment sale of stock, the purchase price for which was largely payable by dividend distributions to the sellers through a Subchapter S masquerade and camouflage. The yearly payments guaranteed to the sellers by the supplement correspond precisely to yearly payments of $5,000 per year to Haley and Caratti and $2,500 per year to Thomson ($500 per share per year), plus 6% interest on the unpaid balance of the total amount due under the supplement ($62,500).[5] The total amount due under this protracted arrangement, including the $500 per share paid outright to the sellers over a three-year period, was $87,500, or about $98,260, including the interest payments on the unpaid balance, figures very close to the sellers' original estimates of Pacific's worth. Hansen at one point argues an option theory to explain the schedules of payments, but we do not find the theory convincing. There were simply too many "options" for Hansen to pick up to make the theory a reasonable one; he had not only the original $10,000 to pay to Haley, but also another $10,000 in guaranteed first year distributions to all three sellers, and still another $10,000 due Caratti at the beginning of the second year, with still another $10,000 or so of payments guaranteed to the sellers. See Moore v. Commissioner of Internal Revenue, 7 Cir. 1941, 124 F.2d 991; Ted F. Merrill, 40 T.C. 66 (1963), aff'd per

---

5. For example, Haley was to receive $1,300 more than $5,000 for the first year of the supplementary agreement, $1,200 more than $5,000 for the second year, $900 in the third, $600 in the fourth, and $300 in the fifth. Those figures correspond precisely to a 6% interest on an unpaid balance of $25,000, the total due to Haley over the five-year period at a rate of $5,000 per year.

curiam 9 Cir. 1964, 336 F.2d 771; Karl R. Martin, 44 T.C. 731 (1965), modified, 6 Cir. 1967, 379 F.2d 282. In addition, it would be a very unusual option payment that included interest on a declining balance, as these payments appear to do. *See* Moore v. Commissioner of Internal Revenue, *supra*. As further supportive evidence, prior to the 1962 agreements, Pacific had paid dividends in January for the fiscal year that ended the previous August, but the corporation had never paid any interest on the intervening four month period. After the agreements, however, the corporation added 6% interest for the four month interim period between the end of the fiscal year and the actual payment of the dividends. We agree with the Tax Court that the coincidences are simply too compelling to lend credence to Hansen's option argument. *Cf. Karl R. Martin, supra*; Moore v. Commissioner of Internal Revenue, *supra*; Miller v. Commissioner of Internal Revenue, 7 Cir. 1957, 247 F.2d 206. An option is a contractual fact, not a post-hoc rationalization. The agreements of November 1962 set up a schedule of payments whereby the sellers could receive their payments over an extended period of time, thus protecting their end of the deal by the escrow arrangement and also garnering some tax benefits by extended payments, and whereby Hansen as buyer could use the distribution of the corporate dividends to complete his payments of the purchase price.

Our conclusion does not rest solely on the schedule of payments outlined in the supplementary agreement, but rather on an overall analysis of who held the greatest number of the incidents of ownership that attended Pacific's stock after the 1962 contracts. *See* Boykin v. Commissioner of Internal Revenue, 5 Cir. 1965, 344 F.2d 889. Formal title did not pass under California law until the escrow terminated according to plan in 1967, but that is not a controlling factor in assessing where the plurality of the incidents of ownership would lie. *Ted F. Merrill, supra*; Boykin v. Commissioner of Internal Revenue, *supra*; Rupe In-

vestment Corp. v. Commissioner of Internal Revenue, *supra*; Estate of Arthur L. Hobson, 17 T.C. 854 (1951); North Carolina Lumber Co., 19 T.C. 587 (1952), rev'd on other grounds, 4 Cir. 1954, 211 F.2d 543; *see also* Griffiths v. Commissioner of Internal Revenue, 1939, 308 U.S. 355, 60 S.Ct. 277, 84 L.Ed. 319. It is also true, as Hansen argues, that the sellers included all of the profits from 1964 in their own incomes despite the language of the supplement that required the sellers to accumulate for Hansen the amount in excess of the sum guaranteed in the schedule. It appears that the sellers actually distributed only the $15,500 allotted to them by the supplement at the end of fiscal 1964, even though each shareholder reported as income his or her ratable share of the entire $26,400 earnings and each paid taxes individually on the earnings so reported. Apparently they eventually did receive the entire earnings for fiscal 1964. The Tax Court acknowledged that this apparent violation of the supplement cannot be explained comfortably by the Government's theory of the case. However, the Tax Court also found that Pacific distributed to each seller an amount precisely equal to the income tax that he or she paid on the income reported that exceeded the express amounts guaranteed by Hansen in the supplement. This expenditure by the corporation would follow from the express terms of the supplement, since Hansen himself was to pay the taxes on the amounts in excess of the guaranteed figures. Hansen has never contended that the sellers' actions in failing to distribute only the amount of earnings prescribed in the supplement was a novation of the original contracts. Hansen argues on the contracts, and he is thereby stuck with the fact that the express agreement called for specific distributions to the sellers with the remainder to be set aside for Hansen.

It is also true, as Hansen argues, that he would have been unable to compel a transfer of the stock prior to the termination of the escrow. That, however, is of very limited probative value in deter-

mining the incidents of ownership for tax purposes. A buyer can clearly have full control of stock without being able to seize it forthwith if he can exercise full voting rights, full managerial or appointive rights, and full rights to allocate the profits of the business. *See, e. g.,* Commissioner of Internal Revenue v. Union Pacific Ry., 2 Cir. 1936, 86 F.2d 637; *Compare Ted F. Merrill, supra,* with *Albert E. Dyke,* 6 T.C. 1134 (1946). Hansen had received the irrevocable voting proxies of every Pacific shareholder pursuant to the first agreement. Hansen's men assumed key positions in the managing and consultive functions of the business almost immediately after the execution of the agreements and continued in those capacities throughout the escrow period; in addition, Hansen himself received regular reports from Houdek and his successor on the financial affairs of Pacific. The supplementary agreement, in particular, clearly indicates that the dividends to be distributed to the sellers according to schedule were the result of Hansen's concession, not the result of the sellers' usual participation in the profits of their own business.[6] Thus, the parties themselves seem to have concluded that incidents of ownership of stock that allow an owner to choose how he will receive his own income or his own tax status were in Hansen's hands at the time of the agreement, not in the hands of the sellers.

Hansen also argues, and the Tax Court agrees, that Hansen did not participate directly in the management of the corporation. But of course personal participation is not a sine qua non in assessing incidents of ownership for tax purposes.

Haley, Caratti, and Thomson all retired from active management of the business within two years of the agreements, Caratti and Thomson working only one day per week for most of the five-year period of the escrow. Houdek, Hansen's man, undertook Pacific's management within one month of the November agreements, upon Haley's complete retirement from the business. Hansen himself was kept generally familiar with the financial status of the business by means of regular reports from Houdek and Houdek's successor. Almost immediately after the agreements, Pacific's old accountant began to submit all of his reports, including the minutes of the purported directors' meetings, to Becker, Hansen's accountant, prior to his own approval. The Tax Court also noted that these arrangements were consistent with Hansen's general methodology in running his various music-oriented businesses throughout the country. And of course Hansen still had his irrevocable voting proxies pursuant to the first November agreement. Thus, the fact that Haley, Caratti, and Thomson met in 1963 and 1964 as "directors" to ratify the corporation's actions of the past year is not of much relevance to our inquiry here. Their agreement to ratify the corporation's purported Subchapter S election could not bind the corporation or the Internal Revenue Service, since for tax purposes the sellers were no longer shareholders in the corporation at that point. *See* Hoffman v. Commissioner, 47 T.C. 218 (1966), aff'd per curiam, 5 Cir. 1968, 391 F.2d 930; 25 C.F.R. § 1.1371–1(d) (1).

In addition, it appears to this court, as it did to the Tax Court, that under the

---

6. "Notwithstanding the provisions of said agreement [the first agreement], I [Hansen] hereby agree that said Pacific Coast Music Jobbers, Inc., shall declare and pay to you [Haley, Caratti, and Thomson] as dividends, earnings or other ordinary income to you on your said twenty (20) shares of its capital stock [or 10 shares in Thomson's case] the following sums for the five (5) fiscal years ending as follows :

$6500 for the year ending August 31, 1963
$6200 for the year ending August 31, 1964
$5900 for the year ending August 31, 1965
$5600 for the year ending August 31, 1966
$5300 for the year ending August 31, 1967
[and half those amounts in the case of Miss Thomson]."

terms of the agreements the sellers no longer assumed the normal business risks attendant to ownership. *See Ted F. Merrill, supra*; Rupe Investment Co. v. Commissioner of Internal Revenue, *supra*. Whatever the corporation's profits might have been after the agreements, the sellers' incomes were expressly guaranteed by Hansen. Hansen disputes this conclusion by asserting that the sellers still absorbed the risk that if the business produced less than the amounts specified in the supplementary agreement, he might nevertheless fail to make his payments as required; in that event, Hansen continues, the sellers' only remedy would be to retrieve their stocks from the escrow agent. While Hansen's facts are correct, his conclusion is not. Becker concluded prior to the execution of the agreements that it was highly unlikely that Pacific would fail to produce profits at the level of those listed by the sellers in the supplementary agreement, and Becker indicated his acceptance of the reasonableness of the sellers' estimates to Hansen when the deal was first contemplated. Even without substantial participation by the sellers in the business, the corporation never made profits below those that the sellers had indicated in the supplement. As Becker and Hansen concluded at the outset, the risk of the guarantee ever being exercised by the sellers was slim, from Hansen's point of view. *See Ted F. Merrill, supra*; Moore v. Commissioner of Internal Revenue, *supra*. At the same time the risks were quite slim as a practical matter that Hansen would ever default in his guaranteed payments to the sellers even should the guarantee be exercised. *See Karl R. Martin, supra*. By the end of the first year Hansen had paid out a substantial part of the purchase price, whatever one accepts as the real purchase price for the stock. Hansen paid $10,000 to Haley at the execution of the contracts, another $10,000 in yearly distributions from Pacific to the sellers. Whether the full purchase price was $87,500, as the Government contends and as this court has concluded, or $25,000, as Hansen contends, those payments amounted to a sizeable percentage of the total purchase price. *See* Moore v. Commissioner of Internal Revenue, *supra*. Pacific continued to pay out dividends to the sellers at rates in excess of those prescribed in the supplementary agreements, and within three years of the five-year escrow period Hansen had agreed to pay $25,000 outright for the 500 shares of stock of the three individual sellers. It does not appear to this court that the "conditions" of the express agreements are such that they would create any substantial risk to the sellers in the normal functioning of Pacific's business. *Compare Ted F. Merrill, supra, with Albert E. Dyke, supra*.

In fact, it appears from the language of the express agreements of November 1962 that the "conditions" of the contracts were not conditions precedent at all. Rather, the November agreements more closely approximate a conditional sale, with the condition subsequent that the sellers might retrieve their stock from escrow if the corporation failed to produce a certain distributable profit and if Hansen thereafter refused to make good on his guarantee. *See* Moore v. Commissioner of Internal Revenue, *supra*. In substance the condition subsequent was simply that Hansen not default on the yearly distributions to the sellers, and that buyer-executed condition cannot reasonably operate by itself to re-shift the risks of business and the incidents of ownership back to the sellers. *See Karl R. Martin, supra*. The November agreements still constituted a sale, with the attendant shift in the incidents of ownership that we have previously discussed. Hansen is correct in acknowledging that the locus of business risk is an important indicium of ownership. But it appears to this court that the business risks of Pacific shifted radically in November of 1962 in the practical context of the express agreements and the attendant and subsequent actions of the parties.

Pursuant to two express agreements in November of 1962, Hansen held irrevocable proxies, placed his own men in key management or supervisory positions as the previous management almost summarily retired, guaranteed certain yearly payments to the absentee seller/managers, forbade the corporation to cease doing business, required the continued filing of Subchapter S tax elections by the sellers, and agreed to pay what he purported to be the entirety of the purchase price for the stock ($25,000, at $500 per share) within two years of a five-year escrow agreement. These are substantive incidents of ownership quite sufficient to uphold the Tax Court's conclusion that Hansen was sole owner of the Pacific stock in November of 1962 for purposes of electing Subchapter S. The contracts of 1962 were, in practical effect and context, an installment sale of the business, with beneficial ownership of the stock transferred immediately and with the purchase price amortized over a period of five years. Since we have concluded that the dividends paid to the sellers in 1964 were part of the purchase price for the business, it is clear that Hansen did derive beneficial income from the distribution. *Compare* Rupe Investment Co. v. Commissioner of Internal Revenue, *supra, with* Bettendorf v. Commissioner of Internal Revenue, 8 Cir. 1931, 49 F.2d 173. Therefore, Hansen, as beneficial owner, is fully taxable on the constructive receipt of the dividends paid by Pacific to the three sellers:

"[S]tock dividend income is taxable to the one who beneficially enjoys the income, regardless of who is the payee or title owner of the stock."

Rupe Investment Co. v. Commissioner of Internal Revenue, 266 F.2d at 630. *See*

Mayer v. Donnelly, 5 Cir. 1957, 247 F.2d 322; Northern Trust Co. of Chicago v. United States, 7 Cir. 1951, 193 F.2d 127, cert. denied, 343 U.S. 956, 72 S.Ct. 1051, 96 L.Ed. 1356; Hoffman v. Commissioner, *supra.*

In conclusion, the contours and curvatures of the figure S as shaped by the Code will not permit ambidextrous shareholdings. We cannot permit the S to become even more contorted and stretched than it already is. The Tax Court, in a thorough and able opinion, saw the opacity of the payout arrangement, and our appellate vista confirms its conclusion that the willowy S was abandoned when Hansen assumed corporate suzerainty but did not himself elect. Hansen might have tried to remain an absentee pretender for the five years of the escrow, but he chose instead to claim his throne by exercising his own business acumen through the instrumentality of his vassals. The Government's case regarding the ownership of Pacific's stock is not arithmetically precise in that the sellers eventually retained all of the corporation's profits for themselves despite expressly contrary language in the November contracts; but we do not require astrophysical precision in order to ascertain as a practical and realistic matter that the bulk of the incidents of ownership that attended the Pacific stock after November of 1962 were with Hansen. And having found that the corporation returned to normalcy in 1962, its distributions of dividends must be attributed to the ultimate beneficiary. The Tax Court's judgment of deficiency against Pacific for corporate income tax in 1963 and 1964, and its assessment of a deficiency against Hansen individually for fiscal 1964 are affirmed.

Affirmed.