CLARENCE L. HOOK AND VIVIAN L. HOOK, PETITIONERS v. COMMIS
SIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 3622–70. Filed May 10, 1972.

*George Constable*, for the petitioners.
*Thomas N. Tomashek*, for the respondent.

SIMPSON, *Judge:* The respondent determined a deficiency of
$16,977.61 in the petitioners' 1966 Federal income tax. The issue for
decision is whether a transfer of stock to a nonconsenting shareholder
caused a termination of a "subchapter S" election by a corporation.

### FINDINGS OF FACT

Some of the facts were stipulated, and those facts are so found.

The petitioners, Clarence L. Hook and Vivian L. Hook, are husband
and wife, who maintained their residence in Bellevue, Wash., at the
time of filing their petition in this case. They filed their joint 1966
Federal income tax return with the Western Service Center of the
Internal Revenue Service in Ogden, Utah. Mr. Hook will be referred
to as the petitioner.

On April 10, 1962, Cedar Homes Manufacturing Corp. (Cedar
Homes) was formed under Washington State law for the purpose of
manufacturing prefabricated wood structures. The petitioner was its
president and, after January 12, 1965, its sole shareholder. The petitioner's wife was its secretary.

From the time of its formation through at least July 20, 1967,
Cedar Homes and the petitioner were represented by a certain law
firm. On November 5, 1964, the petitioner, on behalf of Cedar Homes,
entered into an agreement with such firm, whereby it would provide
general legal services at the usual office rates for a period of 3 years
from the date of such agreement, unless it was otherwise terminated.
Such services were regularly performed by one of the firm's attorneys
(the attorney). The agreement set as maximum outstanding fees $5,000,

and as security for the payment of such fees, the petitioner executed a mortgage secured by property owned by him worth more than that amount.

For its taxable years 1962, 1963, and 1964, Cedar Homes filed Federal corporate income tax returns which reflected losses, and as of December 31, 1964, it had an unused net operating loss deduction of $77,389.89. On January 30, 1965, the corporation filed an election to be treated for tax purposes as a small business corporation (subchapter S election). For the taxable year 1965, the corporation was treated by both the petitioner and the respondent as an electing small business corporation within the meaning of section 1371(b) of the Internal Revenue Code of 1954.[1] Accordingly, while the Form 1120–S filed by the corporation for its taxable year 1965 reflected a loss of $11,934.06, such loss was deducted by the petitioners on their joint individual return for 1965.

During 1966, Cedar Homes continued to experience financial difficulties, and various attempts were made to attract new investors who could supply badly needed capital. During the summer of such year, the petitioner began negotiations with Mr. Charles Davis. Mr. Davis was unwilling to invest capital directly in Cedar Homes, but he was willing to invest in a new corporation (new corporation) to carry on the business of Cedar Homes.

In August of such year, there was an assignment for the benefit of Cedar Homes' creditors, who accepted a settlement of approximately 20 cents on the dollar. It was thereafter apparent to the petitioner's accountant that as a result of such settlement, Cedar Homes realized substantial income which, because of the subchapter S election, would be taxed to the petitioner as its sole shareholder. Sometime thereafter, he advised the petitioner to terminate the subchapter S election by transferring some stock of Cedar Homes to a shareholder who would not consent to the election. In a letter dated November 30, 1966, the petitioner wrote to his attorney:

[My accountant] advises that we need to transfer one share of stock and to "get off" the Sub-Chapter S.

I would appreciate your calling * * * [my accountant] and advising how we should handle this.

On December 9, 1966, an agreement concerning the formation of the new corporation was executed by Cedar Homes, the petitioner, and Mr. Davis. Such agreement was drafted by the petitioner's attorney. Among other things, the agreement provided that the new corporation would carry on the same business as Cedar Homes, which would cease doing business. The new corporation's authorized capital was to be

---

[1] All statutory references are to the Internal Revenue Code of 1954.

$50,000, with 500 shares of $100 par value stock to be divided into 250 shares of class A and 250 shares of class B, the shares equal in all respects, each class to elect 2 directors. Cedar Homes was to subscribe to 250 shares of class A stock and was to transfer its inventory and some of its assets to the new corporation. The petitioner was to hold such stock as nominee for Cedar Homes and was to cause Cedar Homes to transfer such stock to him no later than 6 months and 10 days after the closing. Mr. Davis was to subscribe for 250 shares of class B stock, paying cash therefor on the closing. Within 6 months after the closing, Mr. Davis could require Cedar Homes to purchase his shares 10 days after notice for $50,000 less organization expense. If Cedar Homes was unable to purchase such shares, the petitioner agreed to do so. No party was to sell the shares of the new corporation without first offering them to that company at book value plus after-tax earnings for 2 preceding years. Cedar Homes agreed to sell or lease its machinery and equipment and to assign a lease on its office facilities to the new corporation. The petitioner agreed to lease to the new corporation certain plant facilities then leased to Cedar Homes. A certain bulk sales affidavit was to be filed so that the new corporation could commence business on January 1, 1967. The articles of incorporation and the bylaws of the new corporation were to be prepared by the petitioner's attorney, subject to the approval of the attorneys representing Mr. Davis.

In a letter dated December 14, 1966, the petitioner wrote to his accountant:

Please advise the action necessary in order to "get off" Sub-Chapter S.
Advise relative to the transfer of stock.

I would appreciate your advising myself, * * * [my attorney], or Mr. Davis of any instructions.

Also, in a letter dated December 15, the petitioner's accountant wrote to him:

Regarding Sub-Chapter S election—When we meet with Charles Davis and the new bank next week, we can discuss in detail the action necessary to terminate the Sub-Chapter S election * * *. It is imperative that we undertake the procedures to terminate this election sometime during the week ending December 23, 1966.

On December 23, 1966, the attorney received a telephone call from the accountant with regard to the termination of the subchapter S election. During their conversation, the attorney was advised of the necessity of transferring some of the Cedar Homes stock. He apparently suggested a gift of stock to the petitioner's son, John, but was advised that the transfer had to be a sale. The accountant then asked him to take the stock, but he expressed reluctance to do so. Either on December 23, or thereafter, there was further discussion between them

during which the accountant outlined a transaction in accordance with a certain case he had in mind. As a result of such discussion, the attorney drew up a letter which purported to be an agreement. Such letter provided:

This will confirm our oral discussion concerning necessity for payment or for further security for our services being rendered.

The undersigned met with you today in * * * [the accountant's] office with Mr. Charles Davis and his attorney and his accountant on the subject of investing in your business enterprise which is being conducted by Cedar Homes Manufacturing Corporation. It is obvious that these negotiations and the legal work on your behalf will entail considerable work on our part and that the large account that is owing us will be much larger.

It is also obvious that with some 49,500 shares of $1.00 par value stock unissued and in the treasury of the corporation that a stock dividend should be declared and all of this stock issued to you.

In order to induce us to render these additional services, we ask that you issue 5,000 of your shares (after the stock dividend) to the undersigned, which you can repurchase by February 1, 1967, at the figure of $1.50 per share in cash. Failing that, the undersigned will at that date hold these shares as payment for our services, provided that there is coupled with the issuance of these shares to the undersigned an option to purchase granted by you to the undersigned, whereby the undersigned within one year may purchase your undivided one-half of the so-called Schreurs property for $3,000 cash.

On December 30, 1966, the petitioner met with his attorney in the attorney's office. At that time, the purported agreement between the petitioner and the attorney was signed, but was backdated to November 21, 1966. Certificate No. 5 in Cedar Homes stock record book reflects a transfer dated December 12, 1966, of 49,500 shares to the petitioner. On the reverse side of such certificate, there is an endorsement which purports to transfer 5,000 shares to the attorney. Although such endorsement is dated December 12, 1966, it was in fact also signed at that meeting with the attorney. Certificate No. 6 in the stock record book reflects a transfer of 45,000 shares to the petitioner, and certificate No. 7 reflects a transfer of 5,000 shares to the attorney. The certificates were dated December 29, 1966, but they were signed by the petitioner as president and by his wife as secretary at the same meeting with the attorney, and the certificates were delivered at that time. The petitioner and his attorney made no attempt to ascertain, and did not agree upon, the value of the 5,000 shares transferred to the attorney. Such stock had some value at such time, but such value was speculative, depending upon the success of the business operated by the new corporation. The attorney gave no money or other property for the stock, performed no services therefor, and did not credit the petitioner's account with any amount by reason of the transfer of the stock.

On Cedar Homes' 1966 Federal income tax return, prepared by the accountant, the following statement was made:

On 12–29–66 5,000 shares of Common Stock were issued to \* \* \* [the petitioner's attorney]. This shareholder refuses to consent to a Sub Chapter S election thereby terminating the election.

However, the transfer of the stock was not reported by the attorney to his partners. It was not reflected on that attorney's 1966 individual return, nor on the firm's 1966 partnership return. Similarly, the return of the stock to the petitioner on July 20, 1967, was not reported by such attorney or his firm on any appropriate return. Nor was the 1966 transfer reported by the petitioner on his individual tax return.

While he held the Cedar Homes stock, apparently the sole act by the attorney as a shareholder was to consent to the change of Cedar Homes' name. Such change of name was made necessary by the agreement of December 9, 1966, with Mr. Davis. Between December 30, 1966, and July 20, 1967, the attorney was not an officer of Cedar Homes, and he could not recall whether he was one of its directors. Cedar Homes did not carry on the active conduct of business after December 31, 1966, and it held no shareholders meetings after that time. The attorney received no dividends from Cedar Homes. During such time, the attorney made no inquiry into the management and operation of Cedar Homes, and he had no direct knowledge of the condition of the new corporation.

From 1964 through 1967, the petitioner's attorney was paid in cash for services performed for Cedar Homes. The following table shows the balance due for legal services performed for Cedar Homes by its attorney as of the dates indicated:

| | |
|---|---|
| Sept. 30, 1966 | $5, 923. 39 |
| Dec. 31, 1966 | 5, 068. 59 |
| Feb. 27, 1967 | 5, 820. 32 |
| Apr. 10, 1967 | 6, 143. 72 |

On May 2, 1967, the petitioner authorized his attorney to pay the petitioner's account from trust funds within the attorney's possession. The amount transferred from the trust fund was $6,131.29. As a result of such payment and the recovery of certain other funds, the attorney's record of the account reflected a credit balance of $547.39 on May 8, 1967. On May 22, 1967, a satisfaction of mortgage was executed with respect to the mortgage which secured the 1964 fee agreement.

On July 20, 1967, the petitioner visited his attorney's office in connection with a certain property option. While there, he asked his attorney for and received the return of the 5,000 shares of Cedar Homes stock. The stock record book of Cedar Homes reflects the transfer of the 5,000 shares represented by certificate No. 7 to the petitioner on that date. On the reverse side of such certificate the printed endorsement provided: "For value received I hereby sell, assign and transfer unto \* \* \* [the petitioner] five thousand (5,000) shares [of Cedar

Homes stock] * * *." On such endorsement, the word "sell" was crossed out by the attorney and replaced with the words "release the security and." The petitioner gave no consideration for the return of the stock, and the attorney made no attempt to ascertain its value at such time.

On its calendar year return for 1966, Cedar Homes reflected taxable income of $108,663.57, but the parties now agree that the correct figure was $87,245.66; it also reflected $68,112.27 as income attributable to "forgiveness of indebtedness." Also on such return, Cedar Homes claimed a deduction of $77,389.89 by reason of a net operating loss carryover from the years 1962, 1963, and 1964. The respondent determined that the petitioner was the real owner of 100 percent of the stock of Cedar Homes, and that its subchapter S election was not terminated in 1966. Therefore, he determined that the undistributed taxable income of Cedar Homes was includable in the petitioner's individual gross income for such year.

OPINION

In his statutory notice of deficiency, the respondent made certain adjustments to partnership income and to the petitioner's investment credit which have not been contested; hence, such adjustments must be upheld. *Welch* v. *Helvering*, 290 U.S. 111 (1933). The issue remaining for decision is whether the petitioner's transfer of stock to the attorney caused a termination of the subchapter S election by Cedar Homes.

As a result of the election made by Cedar Homes on January 30, 1965, it was treated for tax purposes as a subchapter S corporation for the year 1965 and for all subsequent years, until the subchapter S election was properly revoked or terminated. Sec. 1372(d). A subchapter S corporation is generally not liable for the income tax, but the income of such a corporation is taxable to its shareholders. Sec. 1372(b). A subchapter S election may be revoked, but by statute, Cedar Homes had to file any such revocation during January of 1966 in order for it to be effective for that year. Sec. 1372(e)(2). Thus, by the time the petitioner realized that Cedar Homes was going to have substantial income in 1966, it was already too late to revoke voluntarily the subchapter S election for that year. It was for that reason that the accountant advised the petitioner and Cedar Homes to arrange for a transfer of stock.

Section 1372(e)(1) provides generally that a corporation's election under section 1372(a) to be taxed as a small business corporation shall terminate if any person who was not a shareholder when the election was made or became effective becomes a shareholder and does not,

within the prescribed time, consent to the election. A termination under such section is effective for the taxable year in which such person becomes a shareholder. Sec. 1372(e)(1); sec. 1.1372-4(b)(1), Income Tax Regs.; *Pacific Coast Music Jobbers, Inc.*, 55 T.C. 866 (1971), affd. 457 F. 2d 1165 (C.A. 5, 1972). To be effective for the purposes of section 1372, a transfer of stock must be bona fide and have economic reality. *Michael F. Beirne*, 52 T.C. 210 (1969); *Henry D. Duarte*, 44 T.C. 193 (1965); see sec. 1.1373-1(d)(1), Income Tax Regs. Objective facts with respect to acts and events occurring both before and after such transfer are relevant in ascertaining whether such transfer was bona fide and had economic reality. *Henry D. Duarte, supra* at 197. Moreover, beneficial ownership, as opposed to technical legal title, is determinative as to who is a shareholder for the purposes of section 1372. *Pacific Coast Music Jobbers, Inc., supra; Harold C. Kean*, 51 T.C. 337 (1968); *Alfred N. Hoffman*, 47 T.C. 218 (1966), affirmed per curiam 391 F. 2d 930 (C.A. 5, 1968). Since the respondent has determined that for purposes of section 1372(e)(1), no transfer of stock took place, the petitioner has the burden of proving that the transfer of stock to the attorney was bona fide and had economic reality. *Henry D. Duarte, supra* at 197; Rule 32, Tax Court Rules of Practice.

The petitioner's primary contention is that in a bona fide transaction he transferred 5,000 shares of Cedar Homes stock to its attorney as a retainer in order to insure his performance of certain future legal services. He argues that as a result of such transfer the attorney became the beneficial owner of such shares on December 30, 1966, and that since the attorney did not consent to its subchapter S election, such election was terminated in that year. Thus, the petitioner argues that he is not taxable on the undistributed net income of Cedar Homes for 1966.

On the other hand, the respondent contends that the disputed transfer was merely a formal device executed solely for the purpose of terminating Cedar Homes' subchapter S election, and that at all times the petitioner remained the real owner of 100 percent of its outstanding stock.

The petitioner relies upon the agreement between himself and the attorney to establish the substance of the agreement. That agreement, although actually executed on December 30, 1966, was backdated to November 21 of that year, and the petitioner suggests that in substance he and the attorney had agreed to the transfer prior to December of that year. However, the surrounding circumstances do not support the petitioner's position.

Although the accountant suggested the transfer, he admitted that he had not seen the agreement until it was shown to him during the course of the audit of the petitioner's return, several years after it was executed. The accountant testified that the transfer was agreed upon at

a meeting at which he was present, but he was unable to fix the date of that meeting. He had no independent recollection of the time when it was decided the stock should be transferred to the attorney.

Indeed, the letters from the petitioner to the attorney on November 30, 1966, from the petitioner to the accountant on the following December 14, and from the accountant to the petitioner on the next day—all indicate rather clearly that there was no agreement on those days as to whom stock in Cedar Homes would be transferred. The attorney testified that it was on December 23 that he first became conscious of the petitioner's need to terminate such election. During his conversation with the accountant, the attorney was informed of the necessity of transferring some of the Cedar Homes stock in order to effect such termination. At such time, he suggested the petitioner's son as a possible transferee; although the accountant asked him to take the stock, he expressed reluctance to do so. Either during the course of that conversation, or later, the attorney eventually agreed to accept the transfer of the stock. Consequently, these circumstances indicate clearly that there was no agreement to transfer the stock to the attorney prior to December 23, 1966.

Moreover, although the agreement between the petitioner and the attorney stated that the Cedar Homes stock was being transferred to the attorney in order to induce him to render additional legal services, the facts simply do not support that statement. The assignment for the benefit of creditors had already been arranged in the summer of 1966. The negotiations with Mr. Davis had already taken place, and the agreement with him had been executed on December 9, 1966. By the last week of December of 1966, when it was decided to transfer the stock to the attorney, the time had almost arrived for the new corporation to take over the business of Cedar Homes, and it would appear that most of the legal work in connection with that transfer of the business would have been performed. If the agreement to transfer the stock to the attorney had actually occurred in November of 1966, the statement in the agreement as to the reason for the transfer would have had more credibility, but since the agreement did not actually occur until the last week of December, such statement is inconsistent with the objective facts in the case.

Nor was there any apparent need to enter into the agreement with the attorney in order to provide him with a retainer to perform legal services during the period subsequent to December 30, 1966. There was already in existence a retainer agreement and a secured mortgage relating to the legal services to be performed by the attorney; it appears that the attorney was content to rely on that agreement, and there are no convincing reasons shown for entering into a new retainer agreement. In fact, the attorney obviously considered the petitioner a

valued client and strongly desired to continue to perform legal work for him and Cedar Homes; and he did continue such work for some time after 1966.

In addition, the attorney did not, in any way, treat the receipt of the Cedar Homes stock as payment for legal services. Although the stock had some value when it was transferred to the attorney, neither the petitioner nor the attorney knew or attempted to ascertain its value. Had they truly intended the transfer of the stock to constitute a payment for services, it would seem that they should have agreed upon the services to be performed or upon the extent to which the transfer would be treated as payment for services; yet, there was no such agreement. Furthermore, the attorney did not inform his partners of the transfer of the stock to him; nor did he or the partnership report the receipt of the stock as a payment for services. In fact, the attorney held a mortgage secured by property to assure that the petitioner would pay for the legal services performed by the attorney, and in May of 1967, all such services were paid for in cash. There was no credit for the transfer of the Cedar Homes stock, although at that time, the attorney still held the stock. The terms of the purported agreement with the attorney may be read to suggest that the stock was being transfered to him as additional security; if that was the purpose, then there was no intent to transfer beneficial ownership, and a mere pledge of stock as security does not constitute a transfer which terminates a subchapter S election. *Alfred N. Hoffman, supra.*

While the attorney held legal title to the Cedar Homes stock transferred to him, his only act as a shareholder was to consent to the change of name required by the agreement of December 9 with Mr. Davis. Cedar Homes held no shareholders meetings after December 31, 1966, and the attorney testified that during the time he held the stock, Cedar Homes could not pay its creditors and therefore could pay no dividends. During such time, he was not an officer of Cedar Homes, and he could not recall whether he was one of its directors. Also, he testified that he made no inquiry into the management of Cedar Homes, and that he had no direct knowledge of the condition of the new corporation.

Finally, on July 20, 1967, while visiting the attorney's office in connection with an apparently unrelated matter, the petitioner simply asked for and received the stock back. The attorney received no consideration for its return, he made no effort to ascertain its value, and he testified that he returned it because of strong feelings with respect to the attorney-client relationship. He also testified that he would have returned the stock because of such feelings even if it had value. He endorsed the stock as if it had been held for security.

The circumstances under which the attorney received the stock, held it, and later gave it up suggest that he took the stock as an accommodation to a valued client. It appears that he was selected in lieu of a member of the petitioner's family. We find that the beneficial ownership of the Cedar Homes stock was not transferred to the attorney and that the transfer of stock lacked economic reality. Accordingly, we hold that throughout 1966, the petitioner was the beneficial owner of all of the stock of Cedar Homes and that there was no transfer of such stock causing a termination of the subchapter S election by Cedar Homes. In view of our finding that the transfer of stock to the attorney lacked economic reality, we do not reach the question as to whether a transfer of such stock, which had economic reality but which was done solely for the purpose of terminating the subchapter S election, would have had such effect.

*Decision will be entered for the respondent.*

---

[1] All statutory references are to the Internal Revenue Code of 1954 unless otherwise indicated.