GINO A. SPECA and VERA SPECA, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent; JOSEPH F. MADRIGRANO and SHIRLEY M. MADRIGRANO, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Speca v. Commissioner
Docket Nos. 8469-75, 8470-75.
United States Tax Court
T.C. Memo 1979-120; 1979 Tax Ct. Memo LEXIS 411; 38 T.C.M. (CCH) 544; T.C.M. (RIA) 79120; March 29, 1979, Filed Stanley P. Gimble, for the petitioners. James F. Kidd, for the respondent. WILBUR
MEMORANDUM FINDINGS OF FACT AND OPINION WILBUR, Judge: Respondent determined deficiencies in petitioners' Federal income taxes as follows: Petitioners
Year
Deficiency
Joseph F. Madrigrano and
Shirley M. Madrigrano
1971
$9,290.86
Gino A. Speca and
Vera Speca
1971
9,108.36
Because of concessions, the only issue remaining for our determination is whether 1971 *412 transfers of stock in a Subchapter S corporation by petitioners to several of their children were sufficiently grounded in economic reality to permit that the income from the stock to be taxed to the transferee-children rather than the transferor-parents. FINDINGS OF FACT Some of the facts have been stipulated. The stipulation of fact and attached exhibits are incorporated herein by this reference. Petitioners Joseph F. Madrigrano and Shirley M. Madrigrano are individuals who resided in Kenosha, Wisconsin at the time they filed their petition in this case. They filed a joint Federal income tax return for the taxable year 1971. Petitioners Gino A. Speca and Vera Speca are individuals who also resided in Kenosha, Wisconsin, at the time they filed their petition in this case. They filed a joint Federal income tax return for the taxable year 1971. [1]
Triangle Wholesale Co., Inc. (Triangle) was formed by Madrigrano, Speca, and Leo Orth on February 29, 1952. *413 Triangle's business during all periods relevant herein was that of a beer wholesaler and distributor for the products of the Joseph Schlitz Brewing Company (Schlitz) and the Miller Brewing Company. Its area of operation was the Kenosha/Racine area of Wisconsin. At the time of its formation 2,112 original shares of stock were issued to the following individuals in these amounts: Name
Shares
Madrigrano
704
Speca
704
Leo Orth
704 In 1961 Madrigrano and Speca purchased the shares of Leo Orth. After this purchase, they each owned 1,056 shares of Triangle stock. In 1963 Madrigrano gave 680 shares of Triangle stock to his four children, Joseph, Glenn, Mary, and Karen, with each child receiving 170 shares. In 1968 Speca also gave 680 shares of Triangle stock to his four children, Armand, Rosalyn, Gene, and Peter, with each child receiving 170 shares. As a result of these gifts, the Triangle stock was owned by the following individuals in the following amounts and percentages: Name
Shares
Percentages
Madrigrano
376
18
Joseph
170
8
Glenn
170
8
Mary
170
8
Karen
170
8
Speca
376
18
Armand
170
8
Rosalyn
170
8
Gene
170
8
Peter
170
8
*414 On or about January 10, 1969, Triangle validly elected to be treated as a Small Business Corporation within the meaning of Subchapter S, sections 1361-1379. [2] Its Subchapter S election has remained in effect through all times material to this case. From 1963 through the time his petition was filed, Madrigrano was president, secretary, and a director of Triangle. For the same period, Speca was vice-president, treasurer, and a director of Triangle. Additionally, Madrigrano was Triangle's chief executive officer and Speca a salaried executive of Triangle for all periods material to this case. They received the following salaries from Triangle: Year
Madrigrano
Speca
1971
$41,800
$41,800
1972
42,525
41,800
1973
42,525
41,800
1974
41,800
41,800
1975
41,800
41,800
On March 31, 1971, Madrigrano conveyed all of his remaining 376 shares of Triangle stock to his sons Joseph and Glenn, who each received 188 shares. In connection with this conveyance, Joseph and Glenn each executed and gave their father *415 a non-interest-bearing promissory note. The two notes were dated March 31, 1971, were each for the face amount of $7,110.97, and by their terms were due on March 31, 1972. Stock certificates evidencing their ownership of these shares were issued by Triangle on March 31, 1971. Joseph was 23 years of age and a full-time, second year law student in 1971 when his father conveyed the 188 shares of Triangle stock to him. He was also employed by Triangle during 1971 on a part-time basis. His employment entailed meeting with the company's drivers, explaining marketing goals to them, reviewing their route books to insure proper distribution, and similar activities. He conducted these activities primarily on weekends and during school vacation periods. Joseph received $2,796.78 in compensation from Triangle during 1971, and $7,335.98 in 1972 according to Triangle's tax returns. Joseph sold his Triangle stock to Glenn in 1975, and has been the Budweiser distributor in the Kenosha, Wisconsin area since 1972. Glenn was 21 years of age, and a full-time undergraduate student in 1971. The Madrigranos claimed him as a dependent on their 1971 Federal income tax return. Glenn worked for *416 Triangle in 1971 on weekends and during the summer when he would work in the warehouse and in soliciting customers. His 1971 Federal income tax return lists his occupation as "student." Triangle's return stated that he received $7,054.40 in compensation during 1971, and $9,364 in 1972. Since his graduation from college in May 1972, Glenn has been employed as sales manager of Triangle. On March 31, 1971, Speca conveyed all of his remaining 376 shares of Triangle to his sons, Peter and Gene, who who were 10 and 7-1/2 years of age at the time. This transaction took the form of a sale in which 188 shares of Triangle stock were transferred to each child for $7,110.97 to be paid by each. However, there were no sale documents, no notes, and no other types of written evidence of a stock sale between Speca and his children. Speca expected payment of the $7,110.97 due from each child to be made from Triangle's profits. Triangle stock certificates were issued directly in the names of Peter and Gene with no custodian, guardian, or trustee named to represent the children, who were minors. The minutes of Triangle's January 1972, shareholders' meeting note that Speca appeared on behalf *417 of Gene and Peter and he signed a "notice of waiver" on their behalf at this time. The minutes of the 1973 shareholders' meeting state that Gene and Peter were present "by proxy" without stating who was the proxy. Speca, Joseph, and Glenn signed the minutes of this meeting. The sales price of $7,110.97 for each 188 shares was set by Madrigrano. He reached this figure by multiplying Triangle's capital stock as reported on its 1970 Federal income tax return by 7 percent. He used a 7 percent figure because he mistakenly believed that 188 shares represented 7 percent of Triangle's outstanding stock rather than 8 percent. Speca used this $7,110.97 figure for each block of 188 shares as the sales price without further inquiry. Triangle's balance sheets for 1970 and 1971 reveal the following amounts of assets, liabilities, and equity: 1970
1971
Total Assets
$414,046.54
$459,419.49
Liabilities
57,869.62
42,912.36
Capital Stock
84,580.00
84,580.00
Retained Earnings
(Unappropriated)
17,005.23
17,005.23
Undistributed Taxable
Income
254,591.63
314,921.90 Triangle's total taxable income and income per share for the years 1967-1973 was as follows: *418 Year
Income
Income/Share
1967
$42,488.16
$ 20.12
1968
46,331.47
21.94
1969
47,178.87
22.34
1970
99,316.55
47.02
1971
90,330.21
42.77
1972
63,021.14
29.84
1973
39,356.23
18.63
Madrigrano filed periodic financial statements with the American State Bank of which he was a director. He listed ownership of 376 shares of Triangle on statements filed prior to March 31, 1971, but indicated no ownership interest on statements filed after that date. Speca also submitted financial statements to financial institutions listing ownership of Triangle stock prior to March 31, 1971, but not indicating ownership of such stock on statements submitted after that date. On April 30, 1971, Madrigrano, acting as president of Triangle informed the Internal Revenue Service that two shareholders had sold their remaining interest. An additional "election by a small business corporation" was filed indicating the March 31, 1971 sale and listing the following as stockholders of Triangle: Name
Shares
Joseph
358
Glenn
358
Mary
170
Karen
170
Armand
170
Rosalyn
170
Gene
358
Peter
358
In order to operate its beer wholesaling and distribution *419 business Triangle was required to have a Federal permit (hereinafter referred to as a "basic permit"). Madrigrano had been indicted for a Federal criminal tax offense prior to 1971 and this indictment was still pending when the transfers were made on March 31 of that year. Madrigrano was concerned at this time over possible revocation of Triangle's basic permit should one of its shareholders be convicted of a criminal offense. After the transfers, Madrigrano sent a letter to the United States Treasury Department, Assistant Regional Commissioner, Alcohol, Tobacco, and Firearms Division, informing him of the transfer of Speca and Madrigrano's shares to their children. Also, soon after the March 31 transfer, "personnel questionnaire" Forms 2625 were filed with the Alcohol, Tobacco, and Firearms Division by Joseph and Glenn, and by Speca on behalf of Peter and Gene. The questionnaires filed by Joseph and Glenn both stated in part: "In March 1971 I purchased by note payable to my dad, Joseph F. Madrigrano, his 7 percent which was $7,110.97." The questionnaire filed on behalf of Peter and Gene simply state "Gift 1971 Gene A. Speca Father." These Forms 2625 also contained questions *420 regarding the individual's prior arrests and convictions for Federal or state law offenses. During 1970 and 1971 Triangle paid large amounts for legal and accounting services in connection with the criminal tax investigation of Speca and Madrigrano and Madrigrano's subsequent indictment and trial. These expenses were treated on Triangle's books as loans to shareholders with the amount owed by Speca being approximately equal to the amount owed by Madrigrano. Triangle listed the following amounts as shareholder loans outstanding at the end of these taxable years: Year
Loans
1969
$ 8,852.30
1970
27,702.30
1971
58,343.41
1972
54,837.14
1973
50,731.34
1974
4,207.77 The following table indicates the amounts owed to and by this account from December 31, 1973 to December 31, 1974: Name
12/31/1973
Debits
Credits
12/31/1974
Madrigrano
$11,615.67
$2,500
$ 1,900.00
$12,215.67
Speca
11,615.67
2,500
1,900.00
12,215.67
Joseph
5,000.00
500
7,142.91
1,642.91 Credit
Glenn
5,000.00
500
8,581.06
3,081.06 Credit
Karen
0
0
4,074.82
4,074.82 Credit
Mary
4,500.00
0
4,074.82
425.18
Armand
8,000.00
0
4,074.82
3,925.18
Rosalyn
5,000.00
0
4,074.82
925.18
Gene
0
500
8,581.08
8,081.08 Credit
Peter
0
500
8,581.08
8,081.08 Credit
Joey Madrigrano, III
0
900
1,438.16
538.16 Credit
Total
$50,731.34
$7,900
$54,423.57
$4,207.77
*421 The majority of the increases in the loans to the shareholders' account during 1970, 1971, and 1972 was due to Speca's and Madrigrano's loans. Approximately half of their repayments of these loans were made by crediting to the account amounts owed them, directly or indirectly, by Triangle, rather than by direct cash payments. Joseph, Glenn, Gene, and Peter each reported $13,301.47 as their proportionate shares of Triangle's taxable income for 1971. Each received a cash distribution from Triangle for 1971 of $2,137.50. Their total tax liability and the amount of tax actually owed as shown on their returns (after credits, withholdings, and estimated tax payments) was as follows: Name
Tax
Tax due
Joseph
$3,926.22
$3,114.30
Glenn
4,752.76
3,949.76
Gene
2,671,87
2,671.87
Peter
2,471.99
2,471.99
Joseph, Glenn, Gene, and Peter each reported $10,682.57 as their proportionate shares of Triangle's taxable income for 1972. Each received a cash distribution from Triangle for 1972 of $2,400. Their total tax liability and the amount of tax actually owed as shown on their returns (after credits, withholdings, and estimated tax payments) were as follows: *422 Name
Tax
Tax Due
Joseph
$6,537.00
$ 3,195.18
Glenn
5,155.79
2,380.12
Gene
2,139.90
2,042.21
Peter
2,129.68
2,031.99
In addition to cash distributions of $2,400, Joseph, Glenn, Gene, and Peter each also received a noncash dividend of $4,000 in December 1972 that was applied against the balance due on the loans from Triangle to their father. This credit on the company's books against amounts owed by their father was in part payment of the purchase price for the 188 shares of stock transferred to them in 1971. Glenn, Gene, and Peter each reported $6,671.18 as their proportionate shares of Triangle's taxable income for 1973. Each of these three received a cash distribution from Triangle for 1973 of $2,400. Joseph reported $5,553.10 as his share of Triangle's 1973 taxable income, and received a cash distribution of $1,950. Their total tax liability and the amounts of tax actually owed as shown on their returns (after credits, withholdings, and estimated tax payments) were as follows: Name
Tax
Tax Due
Joseph
$7,045.99
$2,615.82
Glenn
4,077.00
509.00
Gene
1,653.53
1,188.80
Peter
1,648.25
1,183.52
Glenn purchased *423 a $2,400 certificate of deposit with the cash distributions that he received during the year. In addition to these cash distributions, Glenn, Gene, and Peter each received noncash dividends of $2,400 from Triangle in 1973, and Joseph received a noncash dividend of $1,950. These amounts were again applied against their fathers' loans from Triangle on the company's books as further part payment of the purchase price on the 188 shares of stock transferred in 1971. All of the payments received by Speca for the Triangle stock conveyed to Gene and Peter were by treating noncash dividends as payments on his loan indebtedness on Triangle's books. Madrigrano also collected most of the stock purchase price from Glenn and Joseph in this manner. In addition, he received smaller amounts in cash from them. He finally marked the notes paid and returned them in December 1974. The notes stated that they were to have been paid by March 31, 1972, 1 year from the date they were issued. All of the cash dividends paid to Peter and Gene were deposited for them in their savings accounts. Speca used withdrawals from these savings accounts to pay Peter and Gene's taxes, but none of the money so *424 deposited was used to pay the children's personal expenses. Speca did not use the money in these accounts for his own purposes. The balances in Gene's and Peter's accounts were as follows on the stated dates: Date
Gene
Peter
Aug. 8, 1971
$1,691.48
$2,396.78
Jan. 1, 1973
3,244.62
1,710.93
Jan. 1, 1973
3,244.62
1,710.93
Jan. 1, 1974
3,955.49
3,151.16
Jan. 1, 1975
1,343.73
1,029.43
Jan. 1, 1976
2,477.93
1,606.89
Schlitz sells its product, beer, through distributors and wholesalers like Triangle. Some of these operate under written franchise agreement while others operate under an unwritten declaration of terms by which each party is free to buy or sell as it pleases on an order-to-order basis. Triangle operated on the latter basis with Schlitz until February 1973. Triangle filed a statement of stock ownership with Schlitz on March 12, 1971, at the request of Schlitz. This statement listed Madrigrano and Speca as owners of 14 percent of the stock each, the Madrigrano children as owners of 36 percent, and the Speca children as owners of 36 percent. Schlitz first learned of the change in stock ownership in October of 1972, at which time *425 it requested a meeting with Madrigrano. Schlitz wanted to insure Madrigrano's continued participation in Triangle's operations. Donald Hucko, sales manager for Schlitz in Wisconsin, met with Madrigrano on October 2, 1972. At this time Madrigrano confirmed that he and Speca had transferred their remaining stock to their children, and agreed to inform Schlitz as to future stock changes. He also informed Hucko that Joseph would soon take over the Budweiser distributorship in the Kenosha, Wisconsin, area and no longer be active in Triangle's business. Hucko informed Madrigrano that since he was no longer a Triangle stockholder Schlitz wanted him to enter into an employment contract of at least a 5 or 10-year duration to insure his continued direction of Triangle's day-to-day operations. Hucko described his conversation with Madrigrano in a memorandum sent to his superior at Schlitz. In this memorandum he stated, in pertinent part: He [Madrigrano] stated that these changes had been made in order to save a considerable sum of money for himself and Mr. Speca, as well as permitting them to put a greater contribution into their retirement plan. As you and I know, there was also *426 another factor at this time which could have involved his Federal Basic Permit. * * * At my request, Mr. Madrigrano wrote me the attached letter, outlining what money had been saved by this current stock arrangement. He assured me that he has always been in complete control of Triangle Wholesale Company, Inc. and will continue to do so. At my suggestion, an employment contract has been entered into which ensures Mr. Madrigrano's leadership for at least ten more years. * * * Mr. Madrigrano was informed during our October 2 meeting that since a change of ownership has occurred, paperwork to accomplish this will have to be rendered. This, of course, includes his entering into a Franchise Agreement with [Schlitz] * * *. * * * The "attached letter" described in the memorandum was from Madrigrano to Hucko, and dated October 3, 1972. Madrigrano stated: As per our meeting I have talked to my auditor and this is what it would cost me if I were to own one share of stock in Triangle Wholesale per year. My contribution to the pension program would have to be reduced to $2500.00 because we are a sub chapter and making us a partnership. As far as income, which from my present *427 contribution of $5700.00 per year is a reduction of $3200.00 each for me and Gene making this $6400.00 loss to us. Triangle Wholesale's profit is between $90,000.00 and $100.000.00 per year and with our distribution of 14% each and averaging it to $95,000.00 each of our shares would be a collection of $13,300.00 and at our tax bracket of a minimum of 65% this is $8,645.00 tax each, the 65% is made of about 12% State and 53% Federal. Now is [sic] you take the $13,300.00 and distribute it to the children who are in a lower tax bracket of maximum of 22% this would be $2,926.00. This then is an increase to Gene and I of $5,719.00 each, making this $11,438.00 for both by adding the Pension of $6,400.00 and the tax $11,438.00 we would be paying $17,838.00 more each year. Don, this was only done for this reason, all this figures can be substantiated and I also enclosed a work agreement so that you know I'll be here for ten more years. By the resulting employment contract between Madrigrano and Triangle, Madrigrano was hired "for a period beginning October 1, 1972 and ending September 30, 1982 as general manager, advisor, and consultant to management on all matters pertaining to *428 the business of the Company." For his services he was to receive a salary of "not less than $42,000.00 per year." The contract was discussed at the shareholders' meeting held on January 11, 1972. The minutes of this meeting state that: "Schlitz made it emphatic since he was not a stockholder he must have a five year employment contract. Without this Triangle would be a shell and worthless corporation." Schlitz also required Triangle to enter into a formal written franchise agreement at this time. Preliminary to this an evaluation was made by Schlitz of Triangle to see if it satisfied its "standards of buyer performance." The first such standard was: 1. Active and effective participation in the management of the business; or an acceptable, effective substitute with qualified management personnel * * *. An intracompany memorandum by Hucko stated that Triangle met this standard because: Joseph F. Madrigrano, Sr. will continue as the President and Chief Operating Officer and General Manager of Triangle Wholesale Co., Inc., at least through September 30, 1982, as per an employment contract rendered on the first of October, 1972. As far as Schlitz was concerned, Madrigrano *429 himself was the distributor in the Kenosha area. Madrigrano and Speca continued to run the company in terms of its day-to-day operations after the March 31, 1971 stock transfer. By a corporate resolution dated November 1, 1972, Triangle authorized the purchase of $50,000 life insurance policies on the lives of Speca and Madrigrano payable to Triangle in the event either died. At this same time Triangle also entered into a new arrangement with Speca and Madrigrano regarding their deferred compensation benefits upon retirement, disability, or death. Speca and Madrigrano were two of the three directors of Triangle for all periods relevant herein. Two principal reasons for the stock transfers by Madrigrano and Speca were the desires of petitioners to reduce their state and Federal income tax liability by having income generated by Triangle taxed to family members at lower effective tax rates, and Speca and Madrigrano's desire to maximize their pension benefits from Triangle. The Madrigranos reported adjusted gross income for 1971 of $87,606.25. The Specas reported adjusted gross income for 1971 of $69,117.28. ULTIMATE FINDINGS OF FACT The transfers of stock on March 31, 1971, lacked *430 sufficient economic reality to be effective for Federal income tax purposes. OPINION Triangle is a Subchapter S corporation engaged in beer wholesaling and distributing. Between its creation in 1961 and March of 1971, the Triangle stock was owned half by Madrigrano (and after 1963 by Madrigrano and his four children), and half by Speca (and after 1968 by Speca and his four children). On March 31, 1971 Speca and Madrigrano transferred their remaining shares, which totaled 18 percent each of the total outstanding stock, to four of their children: Gene and Peter Speca, and Joseph and Glenn Madrigrano. The issue for our decision is whether these transfers of stock in 1971 were sufficiently bona fide and real so that the Triangle income attributable to that stock is taxable to the transferee-children rather than to the transferor-parents. Respondent contends that the transfers of stock were not effective for Federal income tax purposes under the principals enunciated in principals enunciated in section 1.1373-1(a)(2), Income Tax Regs.[3] because petitioners Speca and Madrigrano retained excessive control over, and the economic benefit of Triangle. *431 In so contending, respondent relies primarily upon a triad of cases finding intrafamily transfers of stock in Subchapter S corporations ineffective for Federal income tax purposes: Beirne v. Commissioner,52 T.C. 210 (1969); Beirne v. Commissioner,61 T.C. 268 (1973); Duarte v. Commissioner,44 T.C. 193 (1965). Petitioners attempt to factually distinguish these cases, and argue that they have effectively conveyed sufficient incidents of ownership to require that their sons be treated as the true owners of the stock in question. [4]
Section 1.1373-1(a)(2), Income Tax Regs., states, in pertinent part: A donee or purchaser of stock in the corporation is not considered a shareholder *432 unless such stock is acquired in a bona fide transaction and the donee or purchaser is the real owner of such stock. The circumstances, not only as of the time of the purported transfer but also during the periods preceding and following it, will be taken into consideration in determining the bona fides of the transfer. Transactions between members of a family will be closely scrutinized. Thus, beneficial ownership and not mere legal title is determinative in ascertaining the true owners of the stock in question. Beirne v. Commissioner,61 T.C. 268 (1973), Duarte v. Commissioner,supra. See also Wilson v. Commissioner,560 F.2d 687, 690 (5th Cir. 1977), affg. a Memorandum Opinion of this Court; Hook v. Commissioner,58 T.C. 267 (1972). "[Command] over property or enjoyment of its economic benefits marks the real owners for federal income tax purposes." Anderson v. Commissioner,164 F.2d 870, 873 (7th Cir. 1947), *433 affg. 5 T.C. 443 (1945), cert. denied 334 U.S. 819 (1948). In determining who has command over the property or who has enjoyment of its economic benefits, the validity of the transactions under state law is merely one factor to be considered and is not determinative. Anderson v. Commissioner,supra; Beirne v. Commissioner,61 T.C. 268 (1973). We must look to all the facts and circumstances surrounding the transaction to determine whether an actual transfer of the benefits and burdens of ownership has occurred. Additionally, special scrutiny is appropriate here where intrafamily transactions are involved. Section 1.1373-1(a)(2), Income Tax Regs.; Anderson v. Commissioner,supra; Fitz Gibbon v. Commissioner,19 T.C. 78 (1952). Whether petitioners have made a transfer of property which is effective for Federal income tax purposes is ultimately a question of fact. Wilson v. Commissioner,supra at 690-91. See also Anderson v. Commissioner,supra. *434 Speca
A careful evaluation of the evidence convinces us that Speca clearly retained sufficient incidents of ownership to make the income attributable to the Triangle stock he purportedly sold his children in 1971 taxable to him rather than to his children, Gene and Peter. Several factors, no one in itself conclusive, support our conclusion. Initially, we note that the stock was transferred on the corporate books directly to the children, who were minors at the time. There is no evidence that a custodian, guardian, or legally designated representative was ever appointed despite the ease with which such could have been accomplished under Wisconsin's version of the Uniform Gift to Minors' Act. Wis. Stat. Ann., sections 880.61-880.71 (West 1978). Thus, no one ever independently represented the interests of Gene or Peter who were too young at the time (ages 7-1/2 and 10) to effectively represent themselves. Beirne v. Commissioner,61 T.C. 268 (1973); Beirne v. Commissioner52 T.C. 210 (1969); Duarte v. Commissioner,supra at 197. Secondly, there is evidence that even after the purported sale Speca "exercised complete *435 dominion over the stock" of Triangle. Beirne v. Commissioner,61 T.C. 268, 277 (1973). Speca signed a waiver of notice as to the 1972 shareholders' meeting for Peter and Gene and he also approved the minutes of the shareholders' meeting for them. The minutes of the 1974 shareholder meeting state that Gene and Peter were present "by proxy" without stating who the proxy was, but the minutes were signed as approved by Joseph and Glenn Madrigrano (who were both shareholders) and by Speca (who, since he was not on record as a shareholder, must have been representing the shares held by Gene and Peter). Nowhere in the record is there the slightest indication that either Gene, Peter, or anyone acting on their behalf ever independently exercised the ownership rights associated with the stock Speca purportedly sold them in 1971. To the contrary, it appears that Speca paid lip service to his children's "ownership" while managing the company as before. Another factor we consider significant is the control Speca retained both as a key employee of Triangle and as a member of its board of directors. He together with Madrigrano continued to run and control the corporation's *436 affairs after the stock "sale." As was true in Duarte v. Commissioner,44 T.C. 193, 197 (1965): "the evidence reveals that the [petitioners], following the transfers, continued to completely control the policies and operation of the corporation." See also Anderson v. Commissioner,supra. Although no longer shareholders on the books of Triangle, Speca, together with Madrigrano, continued to dictate policy as directors, and also as an employee.Speca's minor children, although technically shareholders, were in no real sense able to exercise their rights to direct corporate affairs. A fourth factor we consider important is the extent to which Speca retained the economic enjoyment of ownership. In analyzing this factor in similar cases, we have generally looked to: (a) the extent to which the childrenshareholders actually receive dividend distributions, and (b) the use of the corporations' undistributed earnings through the mechanism of unsecured loans. Beirne v. Commissioner,61 T.C. 268 (1973); Beirne v. Commissioner,52 T.C. 210 (1969). *437 Applying this analysis to the facts before us we find first, that the amounts distributed in cash to Peter and Gene for the years 1971, 1972, and 1973 were approximately equal to the tax liability incurred. Although the cash dividends paid were deposited in their savings accounts and nothing was withdrawn from these accounts for their or their father's personal needs (except for payment of their tax liabilities), the total amounts in these accounts remained approximately the same from August 8, 1971 through January 1, 1976. Thus, they were denied the usual economic benefits of ownership which shareholders normally anticipate from a profitable company, dividends. Furthermore, no explanation has been offered for the retention of such large amounts of income for the years in issue aside from vague references by Madrigrano about the need for larger inventories. Speca enjoyed significant benefits from Triangle in the form of large and apparently unsecured, interest-free loans. Triangle's shareholder loans increased from $27,702.30 in December 31, 1970 to $58,343.41 in 1971, $54,837.14 in 1972, and $50,731.34 in 1973. Triangle's accountant testified that the majority of these amounts *438 were borrowed by Speca and Madrigrano with each owing approximately the same amount. While a document which was stipulated into the record after the trial indicates that Speca and Madrigrano each owed only $11,615.67 at the end of 1973 and $12,215.67 at the end of 1974, it also proves that both continued borrowing money from the corporation long after they purportedly ceased their status as shareholders. It also proves that they were by far the most significant debtors to this corporate account. There is no indication that either was ever charged interest on these loans. Thus Speca "did not deal at arm's length * * * either in obtaining the advances or paying them back." Beirne v. Commissioner,61 T.C. 268, 277 (1973). Finally, we note that although the transaction was cast in the mold of a sale of stock from Madrigrano to his sons, it fit that mold in neither form nor substance. The children were minors under a legal disability to contract. They could not legally commit themselves to pay the purchase price, and no guardian, trustee, or other legally designated person acted in their behalf. In fact, no notes or documents were executed evidencing the sale or *439 its terms. The price set was a fraction of the stock's book value and amounted to less than the previous year's earnings attributable to the shares sold. [5] Even so, neither child appears to have had other assets from which to pay the purchase price and it is clear that Speca would have to look solely to the Triangle profits for payment--profits which would have been his regardless of the purported sale. See Fitz Gobbon v. Commissioner,19 T.C. 78 (1952).[6] We also note that on the Forms 2625 which he filed for Peter and Gene he characterized the 1971 transfers as gifts.
*440 It is apparent from the record that Speca's sole motives for the transaction in question were tax oriented. He was in a high tax bracket and desired to have Triangle's income shifted to his children where it would be taxed at lower effective rates. Speca also wanted to take advantage of the more generous tax treatment afforded deferred compensation agreements of Subchapter S corporations where the employees are not shareholders. There is no evidence that he, unlike Madrigrano, had been indicted for criminal tax charges and there is no evidence as to what part this indictment played in his decision to transfer stock to Gene and Peter. Rather, it seems consistent with his prior pattern of giving stock to his children. While the desire to legitimately save taxes does not taint an otherwise bona fide transaction, it is also true [That] mere passage of title to income-producing property through devices which are valid under state law will not insulate the transferor against federal income tax liability unless the passage of title is accompanied by a complete shift of the economic benefits *441 of ownership, direct and indirect. Anderson v. Commissioner,164 F.2d 870, 873 (7th Cir. 1947), affg. 5 T.C. 443 (1945), cert. denied 334 U.S. 819 (1948). Such a shift has not occurred here. Speca's position before and after the transfer in question was not so materially different in practical effect to justify shifting the tax on the income from those shares to his minor children within the family unit. Madrigrano
Our analysis of Madrigrano's transfers in 1971 to Glenn and Joseph likewise leads us to conclude that, while the case is much closer, he nevertheless retained such significant economic benefits of and control over the stock of Triangle, that he should be treated as owner of these shares for Federal income tax purposes. Several factors, no one in itself conclusive, support our conclusion. Initially, we note that Madrigrano retained the same economic benefits discussed previously in connection with Speca. He received large amounts of unsecured, interestfree loans from Triangle, the loans remained unpaid for a considerable period, and these loans continued long after his purported sale of his stock interest. Thus, *442 we must conclude that Madrigrano "did not deal at arm's length * * * either in obtaining the advances or paying them back." Beirne v. Commissioner,61 T.C. 268, 277 (1973). In contrast to this, Glenn and Peter were denied the normal benefits a shareholder would anticipate from investment in a similarly successful business. The cash dividends distributed to Glenn and Joseph were approximately equal to the increase in their tax liability due to the inclusion of Triangle's income on their returns. These cash dividends were especially small in comparison with the large profits Triangle made, yet no serious effort was made to show the business reason for the failure to distribute a larger portion of corporate earnings. In short, Madrigrano was obtaining sizeable, unsecured, interest-free loans from Triangle while its purported shareholders received cash dividends in no way commensurate with the corporation profits with no explanation offered for this disparity. Beirne v. Commissioner,61 T.C. 268 (1973); Beirne v. Commissioner,52 T.C. 210 (1969); Duarte v. Commissioner,44 T.C. 193 (1965). Another factor we *443 consider significant is the control retained by Madrigrano as officer, director, and employee. Madrigrano served as Triangle's chief executive for several years and was both before and after the 1971 stock transfer both a corporate director and the individual chiefly responsible for Triangle's business operations. We have seen no appreciable change in his functions or in the corporation's activities generated by the purported change in stock ownership. Rather, Madrigrano, together with Speca, "continued to completely control the policies and operation of the corporation." Duarte v. Commissioner,supra, at 197. Madrigrano's retained control over the operation of Triangle also stemmed from the relationship between Triangle and Schlitz. When Schlitz first learned of the 1971 stock transfer it contacted Madrigrano and required assurances of his continued control over Triangle's affairs. Apparently it received assurances since Hucko wrote his superior at Schlitz that: "He [Madrigrano] assured me that he has always been in complete control of Triangle * * * and will continue to do so." Despite these verbal assurances, however, Schlitz required Madrigrano and *444 Triangle to enter into a 10-year contract insuring continuity of business operations after the "sale" on the same basis as prior to the "sale." This contract was noted by Hucko in an intracompany memorandum as satisfying Schlitz' first buyer performance standard. It is clear to us that without this contract, Schlitz would have ceased its relationship with Triangle--which it could have done given their informal business agreement. Such termination would have destroyed Triangle as an active beer wholesaler and distributor. In discussing the Madrigrano-Triangle contract, the minutes of Triangle's 1972 shareholder meeting make this apparent: "Without this Triangle would be a shell and worthless corporation." Although Madrigrano's children, unlike Speca's, were adults and attended the shareholder meetings, the extent to which they could effectively direct corporate operations was sharply limited by several factors. First both Joseph and Glenn were full-time students in 1971 whose contact with the company was as part-time employees during summers and on weekends. Indeed, Glenn was taken as a dependent on the Madrigrano's 1971 Federal income tax return. The children were completing *445 their formal education and gaining incidental experience preparatory to assuming more responsibility, but their father remained at the helm, completely in control of the corporate vessel. Secondly, because Triangle depended for its business existence upon Schlitz, and Schlitz dealt with it only because of Madrigrano's presence, neither Glenn nor Joseph could effectively challenge their father's judgment. Finally, we have seen no specific instance in which either Glenn or Joseph actually exercised their judgment as shareholders with respect to a corporate decision. Despite their general testimony about taking part in discussions at shareholder meetings, it is apparent to us that the true focus of power lay not in them but in their father. Although Madrigrano's indictment apparently played some part in his decision to transfer the stock in question to his children, it is clear that the same tax-oriented motives which lead to Speca's stock transfers were also primarily responsible for Madrigrano's transfers.Again, while the desire to avoid taxes will not in itself taint an otherwise bona fide transfer of property, Madrigrano failed to surrender the economic benefits and practical *446 control over the property necessary for the transaction to be recognized for Federal income tax purposes. Both Speca and Madrigrano claim that they no longer retained any proprietary interest whatsoever in Triangle after March 31, 1971. But together they continued to control Triangle, they continued to borrow money without interest or security from Triangle, they continued as corporate directors, and their participation in the business was essential for there to be any business in the first place, since Schlitz would not otherwise have dealt with Triangle. Under all the facts and circumstances of this case it is clear that "a complete shift of the economic benefits of ownership, direct and indirect" has not occurred. Anderson v. Commissioner,164 F. 2d 870, 873 (7th Cir. 1947), affg. 5 T.C. 443 (1945), cert. denied 334 U.S. 819 (1948). In conclusion we wish to stress that the issue we have decided here is purely factual and our decision is based on the particular facts, circumstances, and evidence presented. We simply hold that, under these facts and for the year in issue, 1971, the petitioners have retained economic benefits *447 from and control over Triangle inconsistent with their contention that they have surrendered all proprietary interests whatsoever. These retained benefits and powers require that the income from Triangle attributable to these shares be taxed to the transferorpetitioners rather than the transferees, their children. To allow for concessions agreed upon by the parties on other issues, Decisions will be entered under Rule 155.
Footnotes
1. Shirley M. Madrigrano and Vera Speca are parties solely because they filed joint returns with their husbands. Joseph F. Madrigrano (Madrigrano) and Gino A. Speca (Speca), will hereinafter be referred to as petitioners.↩
2. All section references are to the Internal Revenue Code of 1954, as amended and in effect for the period in issue, unless otherwise noted.↩
3. See generally, Haller, "Shifting Family Income Through Subchapter S Corporations: Problems and Planning Possibilities," 5 J. Corp. Tax. 157 (1978); Note, "Assignment of Income: Possibilities Under Subchapter S," 23 Tax L. Rev. 213↩ (1968). 4. See Kirkpatrick v. Commissioner,T.C. Memo. 1977-281↩.
5. At the end of 1970, Triangle's assets ($414,046.54) exceeded its liabilities ($57,869.62) by $356,176.92. Thus, the book value of each of the 2,112 shares outstanding was approximately $168.64. Earnings per share in 1970 were $47.02.The purported sale price of $7,110.97 for 188 shares is approximately $37.82 per share. ↩
6. In contrast to these facts, we specifically found in Kirkpatrick v. Commissioner,T.C. Memo. 1977-281↩, that: the custodian for the children-shareholders "exercised considerable influence over the affairs" of the corporation as director, officer, and shareholders; the transferor retained no control over such shares; the children received dividends and the profits retained were solely those necessitated by a documented need for funds with which to expand; funds borrowed from the corporation were ultimately secured and interest paid on the indebtedness.