LEANDER CROCK AND JOY J. CROCK, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Crock v. Commissioner
Docket No. 20553-80.
United States Tax Court
T.C. Memo 1983-351; 1983 Tax Ct. Memo LEXIS 436; 46 T.C.M. (CCH) 464; T.C.M. (RIA) 83351; June 15, 1983. Alan Doris and Edward Kancler, for the petitioners. Andrew M. Winkler, for the respondent. SHIELDS
MEMORANDUM FINDINGS OF FACT AND OPINION SHIELDS, Judge: Respondent determined deficiencies in petitioners' income taxes for 1975 and 1976 in the respective amounts of $23,097.74 and $45,890.24. After concessions, three issues remain for our decision: (1) the fair market value of 87 shares of stock in Buffalo Valley Ranch which Joy J. Crock contributed to a qualified charitable organization in December, 1975; (2) whether *438 Leander Crock was a shareholder of F. & W. Grocery Company, Inc., throughout the taxable years 1975 and 1976; and (3) whether attorneys fees may be awarded to the petitioners. FINDINGS OF FACT Some of the facts have been stipulated. The stipulation and the exhibits attached thereto are incorporated herein. Leander Crock and Joy J. Crock are husband and wife. At the time they filed their petition they resided in Ohio. They timely filed joint income tax returns for the taxable years 1975 and 1976 with the Internal Revenue Service Center at Covington, Kentucky. Buffalo Valley Ranch
At some time in 1975, but at least six months before December, Joy J. Crock acquired 87 shares of the 1,000 outstanding shares of Buffalo Valley Ranch (BVR), an Ohio corporation. In December of 1975 Joy J. Crock and the other shareholders of BVR donated all of their stock in the corporation to the National Church Aid Association, Inc. (NCAA), a charitable organization described in sections 501(c)(3) [1] and 170(b)(1)(A)(i). In the preparation of their income tax *439 return for 1975, the petitioners assigned a value to Mrs. Crock's stock at the time of its transfer to NCAA of $95,723.49, or 8.7 percent of their estimate of the total value of all of the assets of BVR less its liabilities at the time of the gift. They claimed a charitable contribution deduction on their 1975 return in the amount of the $95,723.49 plus $490 in miscellaneous contributions. This amount was limited to $20,749.77 on the 1975 return under section 170 and the balance, $75,463.72, was carried over to 1976.
In his notice of deficiency the respondent disallowed the charitable deduction claimed with respect to the stock in its entirety on the ground that at the time of the gift the liabilities of BVR exceeded the fair market value of its assets. At the trial the respondent conceded that the value of the assets was greater than the liabilities of the corporation, but contended that the value of the corporate assets was no greater than $914,000 as determined by his appraiser. The parties are in agreement that the value of Mrs. Crock's contribution to NCAA is equal to 8.7 percent of the excess of market value of BVR's assets over BVR's liabilities in December of 1975. They *440 also agree that BVR's liabilities at that time amounted to $749,724.30 and that the charitable deduction is subject to the limitations of section 170. They further agree that the assets of BVR as of December 1975 consisted of approximately 755 acres of land located in Noble County, Ohio and the improvements thereon. The parties do not agree as to what, if any, personal property was owned by the corporation at the time of the gift. The corporation was organized in March of 1972. Its gross receipts through 1975 were as follows: Year
Gross Receipts
1972
$3,962.86
1973
33,825.44
1974
33,500.07
1975
10,585.21
Its tax returns, Forms 1120, for the years 1973 through 1975 indicate that it owned buildings costing $75,000, which included a barn, a store building, two houses, and five bunk houses. The tax returns do not reflect any land during any of these years. The corporation's return for 1974 indicates that on December 31, 1974, it had assets with a total cost of $80,000, and had liabilities totaling $75,194.94.Its return for 1975 indicates that as of December 31, 1975, the corporation had total assets of $76,706.95, and total liabilities of $75,194.94. *441 The parties have stipulated, however, that in December of 1975 the corporation owned the 755 acres and had liabilities totaling $749,724.30. Liabilities of this amount do not appear on the 1975 return or any other return of the corporation. The acreage owned by the corporation was located just off of Interstate 77 and near Marietta, Ohio. On this land and operating under the name of Frontier Vacation Land, the corporation offered camping sites, trails for horseback riding and motorbiking. Improvements on the property included a number of ponds or lakes which were stocked with fish and a three-sided concrete swimming "pool" which was carved out of one of the ponds, together with a general store, a restaurant and bar, three one-family cabins, and five bunk houses or dormitories, each capable of accommodating 22 persons. There also was a barn with 32 stalls for horses and a small, crudely constructed arena with bleachers and chutes. Other improvements in the developed area included four roofed pavillions, three road signs, a laundry and shower room, two toilet buildings and a modular home. Two 13,000 gallon aeration systems provided sewage disposal. The land consisted of *442 two noncontiguous tracts containing approximately 614 and 141 acres. The buildings and other improvements were situated on approximately 60 to 70 acres of the larger tract. The developed area also contained about 30,000 square feet of concrete streets and walks. The remainder of the larger tract, as well as all of the smaller parcel, was hilly with high rock walls and deep ravines. Approximately one half of the undeveloped land had been strip mined with little or no reclamation. All of the undeveloped area was accessible by horses and four-wheel drive vehicles by way of trails and dirt roads leading from the developed area. The smaller tract was located about one half mile from the larger tract and was accessible from the same county road which serviced the entrance to Frontier Vacation Land.The two tracts together were traversed by approximately five miles of graded and ditched gravel roads and ten miles of graded and ditched dirt roads. Each party submitted a written appraisal of the real property and improvements and the testimony of an expert witness. Respondent's expert, E. Ted Golden, lived and had his office in West Virginia, but was licensed as a broker in Ohio *443 and had appraised real estate in southeastern Ohio for more than 20 years. He was an active member of the Ohio chapter of the American Institute of Real Estate Appraisers. He also taught real estate apprisal at a local university. He first examined the subject property in October of 1981. He completed his appraisal in January of 1982, and then submitted a supplementary report prior to the trial which took place on March 10, 1982. Mr. Golden was well qualified to appraise the property, but was obviously handicapped by the fact that he was going so about six years after the date of the gift, and that shortly after the gift, operations at Frontier Vacation Land ceased. Petitioner's expert, Worthy Dyson, was also well qualified to appraise the property. He is a real estate broker by profesion but most of his work has been in appraising. He has made many appraisals in southeastern Ohio for the State of Ohio of land which was purchased to create recreational areas, as well as for the United States Army Corps of Engineers. Mr. Dyson lived and worked in Guernsey County, Ohio, which borders Noble County on the north. He was familiar with the subject property both before and at, *444 or about, the time of the gift. He was, and still is, generally familiar with property values in this area. Petitioner's expert examined the subject property and completed his appraisal in October of 1974, approximately 15 months before the date of the gift. He testified that his appraisal would not have changed through December of 1975. Both experts used the replacement cost approach in valuing the improvements and the market data method of appraising the land. [2] They agreed that the highest and best use of the developed area as well as most of the remaining area was recreational. With respect to the land, Mr. Golden, respondent's appraiser, used 755 as the total acreage and divided it into two general categories, developed and undeveloped. He classified 61.5 acres as developed and the balance of 693.5 acres as undeveloped. By the use of what he considered as comparable sales, Mr. Golden concluded that in December of 1975 the developed land *445 had a value of $1,000 per acre, while the undeveloped land had a value of $300 per acre. In this manner he arrived at a total value of $270,000 for all of the land without improvements. Mr. Dyson, the appraiser for the petitioners, used the same general approach in his appraisal of the land. First, he concluded that the developed area covered about 70 acres with a total value of $68,150, which was roughly in agreement with Mr. Golden's finding that 61.5 acres were developed and had a total value of $62,000. Second, Mr. Dyson found that the property contained about 623 acres of undeveloped land of which he classified (1) 275 acres as a wildlife area with some merchantable timber having a value of $175 per acre and (2) the balance of 348 acres as potential recreational land having a value of $450 per acre. With respect to this 623 acres Mr. Dyson's average value per acre is approximately $330 which is very close to the value of $300 per acre placed on all of the undeveloped land by Mr. Golden. Up to this point, the experts appear to be almost in agreement as to the value of the land since they both valued the 60 to 70 acres in the developed area at about $1,000 per acre and they *446 differed by only about $30 per acre on the undeveloped land. At this point, however, Mr. Dyson still had not placed a value on 57 acres located adjacent to the developed area. Mr. Golden had included this 57 acres in the undeveloped area of his report at $300 per acre. Mr. Dyson found that in 1974, 17 of these 57 acres contained 150 campsites improved with concrete slabs, water and electricity, which he valued at $2,500 per site for a total of $375,000. He found that the other 40 acres contained 350 graded but unimproved campsites having a value of $1,000 each for a total of $350,000. As a result, Mr. Dyson's total appraisal of all of the land was $997,900, which can be broken down as follows: Acres
Appraisal
Description
(rounded)
Per Acre
Total
Developed area
70
$974
$ 68,150
Wildlife area
275
175
48,125
Recreational area
348
450
156,625
Improved campsites
17
22,059
375,000
Unimproved campsites
40
8,750
350,000
Totals
750
$997,900
For comparison, Mr. Golden's appraisal of the land breaks down as follows: Appraisal
Description
Acres
Per Acre
Total
Developed area
61.5
$1,000
$ 62,000
Undeveloped area
693.5
300
208,000
Totals
755  $270,000
*447 From the comparison it is apparent that almost all of the difference in the land appraisals is represented by the 17 acres containing the improved campsites and the 40 acres containing the graded but unimproved campsites. Mr. Golden appraised all of this 57 acres of land at $300 per acre for a total of only $17,100 while Mr. Dyson concluded that this land was worth $725,000 for an average of about $12,700 per acre. A small part of the difference can be accounted for by the fact that in December of 1981, Mr. Golden identified only 101 of the improved campsites with respect to which he included $45,450 or $450 per site in the improvements portion of his report. He did not allocate any value to the other 49 improved campsites which Mr. Dyson found on the 17 acres or to any of the 350 graded but unimproved campsites which Mr. Dyson found on the other 40 acres. Mr. Golden simply stated that he was unable to locate these sites which is understandable in view of the fact that he was trying to find them seven years after Mr. Dyson was there and about six years after operations ceased. Photographs taken by Mr. Golden shortly before the trial in 1982, which photographs were introduced *448 by the respondent, clearly establish that a great deal of deterioration had occurred on the property after operations had ceased and prior to Mr. Golden's visit. Six or seven years of growth by grass, underbrush and vine in a mountainous area such as this would have hidden almost any campsite. Since Mr. Dyson's examination was made while operations were still in existence and within a reasonable period before the crucial date, we choose to adopt his description of this part of the property. In other words, based upon his credible testimony, we find that the 57 acres in 1974 contained the improved and unimproved campsites as described by Mr. Dyson. We also find that such campsites continued in approximately the same condition through the date of the gift. We are unable, however, to adopt Mr. Dyson's appraisal of approximately $12,700 per acre for the 57 acres. The comparable sales which he used consisted for the most part of sales in a much more valuable and less remote resort area. His sales, however, are more in line with the subject property than those used by Mr. Golden which consisted entirely of raw mountain land in non-developed areas. At the time of his appraisal in *449 October of 1974, the petitioners' expert found and included in his report several items of personal property. These items consisted of 40 horses, a bush hog, an Adams grader, a Ford tractor, a wagon, 200 picnic tables, a liquor license, certain restaurant equipment, and cabin furnishings. He appraised these items at a total value of $64,600. The respondent's expert did not include any personal property in his appraisal report and at the trial testified that he did not observe any during his examinations in December of 1981 and January of 1982. He also testified that he was not qualified to appraise personal property. The record contains no evidence of what personal property, if any, was owned by the corporation and on hand at the time the corporate stock was given to NCAA. Mr. Dyson appraised the houses, barns, fences, aeration system, road signs, sewer tile, concrete pads, street lights, a well and other land improvements at a total of $478,875. He also found that the property contained 18 acres of all weather graded and ditched roads which he valued separately at $143,360 and 36 acres of graded and ditched dirt roads which he valued separately at $165,265. Mr. Dyson, however, *450 failed to reduce the road values for any depreciation although he reduced the other improvements by five percent per year for depreciation during the two years of their life prior to his appraisal. He did not show any depreciation with respect to any of the improvements from the date of his appraisal in October of 1974 to the date of the gift in December of 1975. In total, Mr. Dyson's appraisal for the petitioners consisted of the following: Land
$ 997,900
Improvements
buildings, etc.
$478,875
gravel roads
143,360
dirt roads
165,265
787,500
Personal property
64,600
Total
$1,850,000
For his part, respondent's expert, Mr. Golden, appraised the improvements using 6.7 percent for depreciation for a total of $644,000. However, he included in this figure an item of $114,860 which he states is for "entrepreneurship and managerial overseeing of project." We take this item to be Mr. Golden's method of recognizing the fact that the property was obviously worth more while in operation than it was six years after it closed down. In any event, Mr. Golden's complete appraisal for the respondent appears as follows: Land
$270,000
Improvements
644,000
Total
$914,000
*451 F. & W. Grocery Company, Inc.
F. & W. Grocery Company, Inc. (hereinafter referred to as F&W) is an Ohio corporation. During the years in question, it was engaged in the operation of a retail grocery store called "The Food Center." The corporation was organized on January 25, 1963, and on February 19, 1963, it elected under section 1372(a) to be treated as a small business corporation. [3] Under section 1372(c) the election was effective for the taxable year 1963 and for all succeeding taxable years until the election was revoked or was terminated as provided in section 1372(e). No formal revocation of the election was ever made and for each of the calendar years 1963 through 1975 F&W filed income tax returns on Forms 1120S as a small business corporation. For the calendar year 1976 it filed a return as a regular corporation on Form 1120. At all times pertinent to this matter the outstanding stock of F&W consisted of *452 200 shares of common. Prior to May 14, 1973, its stock was held as follows: Name of Stockholder
Number of Shares
Leander Crock
197
Willard Radcliff
1
Corl Radcliff
1
Ford Radcliff
1
Total
200
Willard, Corl and Ford Radcliff were brothers.They were officers and directors of F&W and were actively in charge of the operation of its grocery store. Mary M. Radcliff was their sister. She was not employed by F&W.She was a full-time employee of a local bank. On May 14, 1973, Leander Crock transferred his 197 shares of stock in F&W to Mary M. Radcliff. On the same date she became an officer and director of F&W. The transfer of the stock was made without consideration and it was understood and agreed by and between Leander Crock and Mary M. Radcliff that Leander Crock would continue to be the beneficial owner of the stock, that Miss Radcliff would retransfer the stock to Mr. Crock without consideration upon his request, and that the transfer was being made in an attempt to keep the stock from becoming involved in a divorce proceeding between Mr. Crock and his former wife, Marie Crock. The attempt to keep the stock from becoming involved in the divorce proceeding *453 failed because the divorce court subsequently found that Mr. Crock was the beneficial owner of the stock. In fact, on brief in this matter the petitioners admit that Leander Crock was the beneficial owner of the stock at all times and that Mary M. Radcliff merely held the title thereto as an accommodation for Mr. Crock. On its income tax returns for 1973, 1974 and 1975, F&W allocated that portion of its income which was represented by the 197 shares of stock to Mary M. Radcliff. In each of such years F&W distributed to Mary Radcliff sufficient funds to cover the increase in her income tax which resulted from reporting the share of income attributable to the 197 shares. The balance of the income attributable to such shares was held by F&W for the benefit of Leander Crock. On April 28, 1976, Mary M. Radcliff at the request of Leander Crock retransferred the 197 shares to him. This transfer was also made without consideration. In his notice of deficiency, the respondent determined that F&W was a small business corporation during both of the years 1975 and 1976 and that the portion of its income which was represented by the 197 shares of stock was attributable to Leander Crock. *454 Attorneys Fees
The petition in this case was filed before February 28, 1983, the effective date of section 292 of the Tax Equity and Fiscal Responsibility Act of 1983, Pub. L. No. 97-248, 96 Stat. 324, which provides for the award of attorneys fees and costs to the prevailing party in a Tax Court proceeding. OPINION Valuation of Buffalo Valley Ranch
Respondent disallowed the charitable contribution claimed by the petitioners with respect to the 87 shares of stock in BVR on the ground that at the time of the gift the liabilities of BVR exceeded the fair market value of its assets.At trial, respondent conceded that the value of the assets was greater than the liabilities of $749,724.30 but contended that the value of the corporate assets was no greater than $914,000, as determined by Mr. Golden. The parties are in agreement that the value of Joy Crock's contribution to NCAA is 8.7 percent of the excess of market value of BVR's assets over BVR's liabilities as of December 1975. They agree that the contribution deduction is subject to the 30 percent limitation of section 170(b)(1)(C)(i) for taxable year 1975. They further agree that the assets of BVR included the *455 land in Noble County and the improvements thereon, but disagree as to their value. The parties are in total disagreement as to the personal property. Respondent contends that the petitioners have failed to prove that any personalty was included and if so the value thereof. Section 170 allows an individual a deduction for charitable contributions subject to certain percentage limitations and with a carryover of any excess contribution. See section 170(b) and (d). If the charitable gift is of property other than money, the amount of the contribution is the fair market value of the property as of the date contributed, reduced when necessary as provided in section 170(e)(1). Section 1.170A-1(c)(1), Income Tax Regs. The generally accepted definition of the fair market value is set forth in respondent's regulations as "the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having reasonable knowledge of relevant facts." Section 1.170A-1(c)(2), Income Tax Regs. The fair market value of property as of any given date is a question of fact, to be resolved by considering and weighing all *456 relevant evidence in the record. Kaplan v. Commissioner,43 T.C. 663, 665 (1965). Respondent's determination as to the fair market value of the subject property is presumptively correct, and the burden of proving a higher value rests on petitioners. Welch v. Helvering,290 U.S. 111 (1933); Rule 142(a), Tax Court Rules of Practice and Procedure.
The record reflects a number of infirmities. Petitioners' appraisal was performed in connection with the offering of the property for sale in October 1974. Petitioners' expert assigned a 20-year useful life to certain improvements on the property. He then subtracted 10 percent from the value of these improvements to reflect depreciation for the first two years of operation of the recreational area. However, he neglected to allow depreciation for the third year of operation in 1975, insisting, without explaining why, that his appraisal was valid even though 14 months had intervened between the date of appraisal, October 1974, and the date of contribution, December 1975. He also failed to apply any depreciation to his appraised value for the roads on the property. With respondent's appraisal we *457 have other problems. Its primary weakness lies in the late date of the appraisal, more than six years after the contribution to NCAA was made. Frontier Vacation Land ceased doing business at some point shortly after December 1975 and respondent's photographs, taken in 1982, reveal marked deterioration. In any event, the state of the property in 1982 is of little help in determining its value in 1975. Another problem with respect to respondent's appraisal is that his expert overlooked or ignored certain improvements such as a walk-in cooler in the general store and two 13,000 gallon aeration tanks for sewage.
These difficulties acknowledged, the main dispute between the parties lies in the value each assigned to the land and whether or not any personalty was included. As noted, both experts used the market data approach to valuing the real estate which required them to determine its highest and best use. While the experts agree that the highest and best use of the 60 to 70 acres of the developed area of Buffalo Valley Ranch was as a commercial recreation area, their opinions are sharply divided on the highest and best use of a portion of the undeveloped acres of real estate. *458 Respondent believes that the entire remainder area should be sold as vacant land at $300 per acre. In contrast, petitioner divides the undeveloped area into four categories: (1) 275 acres of wildlife covered with merchantable timber at $175 per acre; (2) 348 acres of potential recreation land at $450 per acre; (3) 17 acres containing 150 graded campsites improved with water and electricity at $2,500 per site; and (4) 40 acres containing 350 graded but unimproved campsites at $1,000 per site. As pointed out hereinbefore, the average per acre appraisal by the petitioners of the wildlife land and the potential recreation land is only $30 more than the respondent's $300 per acre.The dispute with respect to the land, therefore, lies in the 57 acres containing the improved and unimproved campsites. In forming a judgment as to the value of the improved and unimproved campsites, petitioners' expert concluded that their highest and best use was for sale to campers. He, therefore, examined three parcels which had been subdivided and marketed to the public. The first involved the development of 113 acres into 573 lots near Seneca Lake just north of Noble County, ranging in size from 35 *459 by 80 feet to 60 by 100 feet. These subdivisions were to be serviced with county water and private sewage disposal. The plans included graveled streets and commercial sections. In about six months, 20 of the lots had been sold at prices of $2,500 to $4,600 per lot. He also examined sales of lots in Buffalo Hills, a development south of Seneca Lake in Noble County. Still in the planning stage, this recreation area was to have roads, public water and private sewage disposal. Buffalo Hills' chief attraction was its proximity to Seneca Lake. "A great number of lots" sold from $3,500 and up, petitioners' expert states in his appraisal. He described the acreage in Buffalo Hills as rolling to steep hillsides. Petitioners' expert also examined the sale of 4.3 acres of land at $2,110 per acre located a few miles south of the subject property and just west of Interstate 77. The tract was irregular in shape and composed of fairly level, hilltop land. The parcel did not have public water or sewage and was subject to three pipeline easements. We are not persuaded from this grouping of "comparable sales" that the improved and unimproved campsites on the soubject property were worth *460 the value petitioners gave them. Clearly, the last sale cited is irrelevant to campsite development while the first two developments are located in a distinctly superior region--the publicly owned Seneca Lake area which comprises several hundred acres of lake, a marina, beachfront, tennis courts and recreation hall.No such elaborate development existed at Frontier Vacation Land which had no more than 150 campsites each containing about 1,600 square feet and improved by 8 by 8 foot concrete slabs, and picnic tables secured by angle irons, every other one with water and electricity. The other 350 campsites were comparable in size but were only graded without other improvements. Moreover, the topography was described as mostly unreclaimed strip mine terrain with high walls and deep ravines, hardly rolling countryside. Considerable downward adjustment is necessary in our case from the $2,500 to $4,600 prices obtained for the lots near Seneca Lake and at Buffalo Hills. Estimating the highest and best use depends on many factors in addition to a site's general location and physical features, including market conditions such as supply and demand. A projected highest and best use should *461 have a strong possibility of achievement. It should not be remote, speculative, or conjectural. McGovern v. New York,229 U.S. 363, 372 (1913). Although petitioners' expert explored the selling prices of subdivided lots in the area, and estimated that the BVR lots could be sold in two to five years, he ignored the expenses of subdividing, including costs associated with surveying the property, obtaining approval for the plats, abstracting title, and the development of roads.
Furthermore, he failed to consider brokerage commissions and other sales expenses which must be subtracted from the total retail value to arrive at an average anticipated income from the lots. The present estimated value of lots to be sold each year must also be adjusted by a discount factor representing the buyer's interest on his investment and real estate taxes. [4] Any other expenses of subdividing must be subtracted from the anticipated sale of the lots in order to arrive at the fair value of the proposed campsite acreage. Petitioner's analysis takes none of these factors into consideration and therefore must be severely discounted. *462 Respondent cited 18 sales of acreage in Noble County, some improved, some not, to support his valuation. Five of the tracts, ranging in price from $239 to $393 an acre, had terrain similar to the 61.5 developed acres of subject property, direct access from state or county roads, and availability of public water and gas. Four tracts with inferior access and terrain were sold at prices from $59 to $239 an acre. Respondent's expert compared these parcels to the undeveloped area of the subject property. The highest unit prices were paid for land in the northern part of the county near Seneca Lake, $757 to $936 an acre. Fewer than 100 acres were included in each of the three sales of higher priced land. Respondent's expert also examined 30 sales of real estate in five counties in eastern Ohio. The sales represented typical acreage transferred in the period 1973 through 1978. Some parcels were developed as home sites, others remained farmland, while some were strip mined. In this grouping the average tract size was 171 acres and the average price per acre was $213. Unit prices ranged from $57 to $495 per acre. It is noted that respondent's "comparable sales" are also not clearly *463 in point. All of his involve tracts of land not associated with any recreational development. The presence of even a limited development such as we have here obviously adds something to the value of the campsites. Having carefully considered all of the evidence and the reasoning of both parties, we conclude that the value of the land, unimproved was $510,000 in December 1975. Our breakdown is as follows: Developed area (70 acres)
$ 70,000
Campsites (57 acres)
250,000
Undeveloped area (623 acres)
190,000
$510,000
We have found that the record in this case contains no evidence that any personal property was owned by the corporation at the time of the gift. [5] We must conclude, therefore, that the petitioners have failed to carry their burden of proving that any part of the personal property appraised by Mr. Dyson should be attributed to the value of the stock. He made his appraisal in October of 1974 and we have no reason to doubt his testimony that the horses and other personalty were there at that time but on this record we cannot assume that they were still there at the time of the gift. *464 Regarding the improvements on the subject property, we are persuaded that petitioners' valuation, after adjustments for additional depreciation, is acceptable. Their appraisal, performed in 1974, the year before the gift, came during the operation of Frontier Vacation Land. On the other hand, respondent's expert examined the improvements six years after the date of the gift, several years after all business activity had ceased, and after a great deal of deterioration had obviously occurred. Respondent found the improvements in disrepair, owing perhaps to low quality building materials and poor construction, a point he underscores throughout his report.However, the disrepair could also be due to neglect and the passage of time because petitioners' photographs taken in 1974 show finished and painted buildings in a good state of repair. Respondent's photographs taken in 1982 show no street lights on cabin row and he did not include any in his appraisal, yet petitioners' photographs clearly show the presence of cast iron street lights. Furthermore, respondent's expert failed to include a walk-in cooler, ten lights around the arena, and two 13,000 gallon aeration systems. He admitted *465 on cross examination that these items should have been included in his appraisal. We think petitioners' expert was in a far better position in 1974 to value the improvements than respondent's was in 1982. Therefore, with respect to the improvements we find that their value on the date of the gift was $700,327, which represents Mr. Dyson's appraisal with adjustments for depreciation of five percent per year for three years on the roads and one year on all other improvements. In summation of this issue we conclude that the value of the land and improvements of BVR in December of 1975 was $1,210,327. [6]
*466 The Ownership of F&W Stock
The issue to be decided with respect to F&W is whether or not Leander Crock was a shareholder during the taxable years 1975 and 1976. The resolution of this question turns on whether Mr. Crock made a valid transfer of his F&W stock in 1973. The respondent argues that Mary M. Radcliff merely held the F&W stock as a nominee for Mr. Crock. In the respondent's view Mr. Crock remained the owner of the shares at all times and no transfer ever occurred which caused a termination under section 1372(e) of the status of F&W as a small business corporation. We agree. In this case the petitioners initially contended that in 1973 Mr. Crock sold his stock to Mary M. Radcliff and repurchased it in 1976. However, by trial the petitioners were willing to stipulate that Miss Radcliff's version of the stock transaction was true. As stated in our findings of fact, her version was that Mr. Crock was the beneficial owner at all times of the stock and that she merely held the title thereto during his divorce proceeding as an accommodation to him. Her version is borne out by the fact that she merely carried out his instructions and never at any time made any *467 independent decision with respect to the stock. Furthermore, at Mr. Crock's direction F&W distributed to her sufficient money to cover the increase in her income tax caused by the inclusion in her return of the income attributable to the stock during 1973, 1974 and 1975.The record contains no evidence that she ever took any action with respect to the stock or with respect to the corporation except at the express direction of Mr. Crock. We are forced to conclude, therefore, that she was nothing more than his nominee and the transfer on the corporate books had no economic reality. Under very similar circumstances we have previously concluded that a transfer of stock did not occur. Hook v. Commissioner,58 T.C. 267 (1972). See also Wilson v. Commissioner,560 F.2d 687 (5th Cir. 1977), affg. our decision in another similar case. But see T.J. Henry Associates, Inc. v. Commissioner,80 T.C. 886 (1983). We also agree with the respondent that an attempt such as that undertaken by Mr. Crock to transfer an asset in order to avoid a possible adverse judgment is void under Ohio law. Pride v. Andrew,51 Ohio St. 405, 38 N.E. 84 (1894); *468 53 Ohio Jur. 2d Trusts § 100. In view of the foregoing, we conclude that Mr. Crock never effected a transfer of his F&W stock either in trust or otherwise. Consequently, we need not consider petitioners' argument to the effect that the status of F&W as a small business corporation was terminated when the trust of which Miss Radcliff was trustee and Mr. Crock was the beneficiary became a stockholder in violation of section 1.1371-1(e), Income Tax Regs. Respondent's determination on this issue will be sustained. Request for Attorneys Fees
Petitioners requested attorneys fees in their petition and on brief. However, their petition was filed before February 28, 1983, the effective date of section 292, Tax Equity and Fiscal Responsibility Act of 1982, Pub. L. No. 97-248, 96 Stat. 324, 572, and therefore we are without jurisdiction to award such fees in this proceeding. McQuiston v. Commissioner,78 T.C. 807 (1982). See also Key Buick Co. v. Commissioner,613 F.2d 1306 (5th Cir. 1980), affg. 68 T.C. 178 (1977). To reflect the foregoing, Decision will be entered under Rule 155.
Footnotes
1. All statutory references are to the Internal Revenue Code of 1954, as amended, in effect during the years in issue.↩
2. Respondent's expert also submitted a supplemental report which contained an income analysis of the property. Since his income figures were based entirely on estimates, we have accorded it no weight in reaching our conclusions.↩
3. The Subchapter S Revision Act of 1982, Pub. L. 97-354, 96 Stat. 1669, renumbered and significantly changed the rules applicable to electing corporations, effective for tax years beginning after December 31, 1982. See section 1361, et seq.↩
4. See E. Friedman, Encyclopedia of Real Estate Appraisal, pp. 927-929 (Third Ed., 1978).↩
5. Picnic tables attached to concrete slabs were taken into account in the Campsite Valuation rather than given an independent value.↩
6. This issue should have been settled in pretrial conference. We are thus forced to try to render judgment on a record that reflects a great many infirmities. For example, Mrs. Crock acquired the 87 shares of stock in Buffalo Valley Ranch during 1975. The amount she paid for the stock might have been extremely probative of the fair market value of Buffalo Valley Ranch in December of that year. Also, the corporation's returns did not reflect any land and its liabilities increased from $80,000 to $749,724.30 in 1975, leading respondent to suggest that all of the real property was purchased by Buffalo Valley Ranch in 1975. Yet neither party saw fit to inform the Court of the details of these transactions. In spite of our admonition that we may adopt one party's position over the other's see Buffalo Tool & Die Mfg. Co. v. Commissioner,74 T.C. 441, 452↩ (1980), we found it impossible to do in this instance with so many weaknesses on both sides.